M‘Kean,
 
 Chief Justice.
 

 The same difficulty, that occurred in the case of
 
 Bernardi v. Motteux, Doug. 555,
 
 certainly occurs in the present case:—how is the ground of condemnation to be ascertained ? The libel asserts in one place, that the property
 
 *274
 
 is
 
 French;
 
 in another place, that it is
 
 American;
 
 and the several statements, that the vessel was employed in assisting, or supplying, the
 
 French,
 
 also imply that it belonged to a neutral owner. The decree, however, is general: but can we impute to it, the absurdity of meaning to decide, that the vessel and cargo were, at the same time, neutral and enemy property?
 

 Shippen,
 
 Justice.
 

 If the libel had confined itself to alledge, that the property was French, and the decree had been general; or, if the decree had specifically selected and stated that allegation, as the ground of condemnation, I should have been strongly inclined to think, that we were bound by the decision. But the object of the present enquiry is, to ascertain for what cause the vessel and cargo have been confiscated ?
 

 The counsel for the defendant, perceiving the biass of the Court so much against them, declined pressing any further the argument in support of the binding nature of the decree of condemnation; and left their case to the Jury, simply upon the plaintiff’s alledged concealment of the information contained in the captain’s letter, communicating the capture of the vessel. The opposite counsel having, thereupon, proved that the plaintiff was an
 
 American
 
 citizen, and sole owner of the vessel and cargo, the following charge was delivered by the
 
 Chief Justice,
 
 after a general recapitulation of the facts :
 

 M‘Kean,
 
 Chief Justice.
 

 The first ground of defence attempted to be taken on this occasion, is; that the vessel was engaged in a trade with the
 
 French
 
 islands, which, as it was not permitted by the
 
 French
 
 government previously to the war,
 
 Great Britain,
 
 it is said, had a right to deem unlawful, and to construe into a violation of our neutrality. The fact has not been established : But, if it had been established, I could not accede to the conclusion, which the defendant’s counsel contemplated. I cannot conceive, upon what principle, our accepting a benefit is to be converted into the perpetration of a wrong. What injury can be done to any belligerent power, by our sending the exports of
 
 America
 
 (not of a contraband nature) to a new market ? Where is the cause of offence ? In what consists the infraction of neutrality ? We are not actuated by motives of partiality and favoritism; for, we are willing, of our own accord, to pursue the same course with
 
 Great
 
 Britain, as well as France; and we find that, in fact, the colonial governments of
 
 Great Britain
 
 often invite us, during a war, to an intercourse in trade, which is, at other times, absolutely interdicted. We cannot prevent another nation from offering a bounty to our commerce, by opening a free port, or by relinquishing its duties; and when we merely accept these advantages, on a principle of self-interest, why shall we be charged with a breach of our neutrality ? No: The rule, on the point of neutrality, is just and clear: It is
 
 *275
 
 simply this:—If two nations are at war, a neutral power shall not do any act, in favor of the commercial, or military, operations of one of them; or, in other words, it shall not, by treaty, afford a succour, or grant a privilege, which was not stipulated for, previously to the commencement of hostilities.
 

 The second ground of defence, is founded on the capture and condemnation of the vessel at
 
 Bermuda.
 
 It is urged, that the libel states the property to be
 
 French
 
 ; and that the decree being general, affirms that allegation. But the libel consists of five charges ; and if the charge of
 
 French
 
 property is affirmed, the other four, which stand precisely on the same footing, must be arbitrarily excluded; since, under different modifications, they alledge the property to be
 
 American.
 
 It is impracticable, therefore, to fix the precise cause of condemnation by an inspection of the record itself; but, we are clearly of opinion, that, under such circumstances, evidence may be received to establish the
 
 American
 
 ownership, in conformity to the warranty; As, then, the proof leaves no doubt on the question of ownership, we cannot presume that the Judge of a foreign Court has perjured himself, by declaring that property to be French, which we know to be
 
 American
 
 ; and, of course, we must assume the position, that his decree proceeded upon the other allegations of the libel. Those other allegations do not furnish any cause for cancelling the policies in the present case, either in relation to the express warranty, or to the matter charged. An
 
 American
 
 citizen may lawfully, at any time, carry flour, and other articles of provision, or dispatches, for a
 
 French
 
 minister, from an American, to a French, port.
 

 The third ground of defence states, that there was a concealment of some material facts, in regard to the risque, which were known to the plaintiff at the time of the defendant’s undertaking the insurance;—such as the outward transportation of a cargo of flour for
 
 Mr. Fauchet,
 
 and the homeward accommodation of
 
 French
 
 soldiers, with their baggage. If this statement is correct in point of evidence, the law arising from it is certainly in favor of the defendant. But the weight of the testimony does not seem to support it. There can be no imputation of concealment, where each party had an equal opportunity of acquiring a knowledge of the fact; and there is strong reason to believe, if not direct evidence to shew, that the plaintiff gave the defendant that opportunity, by placing in his hands the captain’s letter, reciting all the circumstances. If the defendant then refused, or neglected, to read the letter, it cannot now be assigned as a cause for vitiating the policies. Besides, if all the circumstances had been perfectly understood, there was nothing which any lawyer would have pronounced to be illicit in the trade. The cargo of flour was at the risque of the plaintiff, till it was
 
 *276
 
 actually delivered ; and I have never heard of any law, in any civilized nation, that deemed it contraband, or unlawful, to carry a few, unarmed, invalid soldiers, to a neutral country, in pursuit of health and refreshment.
 

 A fourth ground of defence has been taken, upon this consideration, that the household furniture of the passengers came within the description of the cargo of the vessel; and, therefore, the warranty had not been strictly performed. I confess, that I agree in the general idea, that household furniture cannot be regarded as baggage, and must constitute a part of the cargo ; but still, to admit this exception, under the peculiar circumstances of the shipment, would be too indulgent to a harsh and captious spirit of litigation; nor, throughout the history of Admiralty proceedings, can there be traced a single instance of condemnation, for such a cause.
 

 Upon the whole, it is our opinion, that the plaintiff is entitled to recover the amount of both Policies.
 

 Verdict for the Plaintiff.
 
 *
 

 *
 

 At
 
 the close of the charge, Tilghman claimed leave to tender a bill of exceptions, because the Court did not direct the Jury, in point of law, to consider the decree as conclusive.
 

 By the Court :—We do not say what would have been our opinion, if the decree had expressly condemned the property as
 
 French:
 
 but, in its present state, we do not think it conclusive, to prevent evidence that the cargo was actually neutral.
 

 The defendant afterwards moved for a new trial, but it was refused. He then brought a writ of error; but, on the 13th of July 1797, the judgment, entered in pursuance of the verdict, was affirmed.