## ADJUDGED IN THE

# COURT FOR THE CORRECTION OF ERRORS

IN THE

## STATE OF NEW YORK,

IN FEBRUARY, 1802.

---

JOHN C. VANDENHEUVEL, *Plaintiff in Error, against* THE UNITED INSURANCE COMPANY, *Defendants in Error.*(a)

In an action on a policy of insurance, the sentence of a foreign court of admiralty is not conclusive evidence as to the character of the property, and a breach of the warranty of neutrality.(b)

THIS cause came before the court on a writ of error from the supreme court. For the facts in the case, and the opinion of the court below, see *ante,* pp. 127—168.

VAN VECHTEN, Senator. Two questions are presented for our consideration :

1. Whether the description of the ship in the policy, as being American, and the plaintiff's representation of her being his property, amount, in judgment of law, to a warranty of her neutrality ? if so, then,

2. Whether the warranty is conclusively fulfilled by her condemnation, as enemy's property ?

(a) S. C. 2 Caines' Cas. in Error, 217.

(b) See *supra*, p. 144, n. (*b*.)    Story's Conflict of Laws, ed. 1846, § 593, and references.

In examining these questions I have sought, with solicitude, to ascertain what the law is, and candor constrains me to declare, not without a leaning against the result [*452] which my investigation has produced. But, as *we are called upon to pronounce the law as we find it, I hold it to be my duty to deliver that result, referring it to the proper authority to alter the law, if an alteration shall be deemed necessary.

1. I take the rule to be well settled, that all contracts of insurance must be founded on truth, and a fair disclosure of every fact which is material to the risk to be run. When, therefore, an inhabitant of a neutral nation requires insurance to be made in time of war, on a ship which he states to be of the same nation; the natural inference is, that the property he wishes to have insured is neutral. But when he goes still farther, and assents to insert in the policy such a description of the vessel, as is strictly applicable to a neutral ship only, it must be deemed equivalent to a warranty of her neutrality; and the reasonable interpretation of the contract is, that it was so intended by the parties. What else can be the object of the description? Or, what other use can be ascribed to it? Surely the court cannot intend that its insertion was without a meaning.

In the case before us, the ship is described as *the good American ship, the* Astrea, and represented to be the property of a citizen of New York, where all the parties reside. What is the language of this transaction? The plaintiff requests insurance on a ship; the defendants inquire, what ship? He answers, an American ship, the Astrea. Again, the defendants ask, whose property is she? To which the plaintiff replies, mine. From such a statement of facts, what other reasonable inference can be deduced, than that the plaintiff meant it to be understood by the defendants, that the ship in question was American, and the property of an American citizen; and consequently neutral? (See *Goix* v. *Low*, 1 Johns. Cases, 341.)

If this exposition of the contract is correct, it follows, that

on the neutrality of the ship depends the validity of the policy.

*2. From an attentive examination of the autho-    [*453]
rities relative to the efficacy of the judgments of for-
eign courts of competent jurisdiction, I have no doubt that
they are conclusive evidence of the facts upon which they
are found.   If it be not so, this absurdity will result; the
courts of one nation may have jurisdiction of certain causes,
may try and determine them, and without reversing those
determinations, the courts of another nation may try the
same causes over again, and give contrary decisions; and
thus, there would be contradictory determinations in force
upon the same subjects, and at the same time, by courts of
equal authority.

The distinction which is contended for by the opposers of
this doctrine, that the sentence of a foreign court of admiral-
ty is conclusive to change the property that may be sold
under it, but not to bind those whose warranty of the pro-
perty is expressly falsified by the sentence, is to me very un-
satisfactory.   Either the court has full power to decide the
point on which the condemnation rests, or it has not.   If it
has the power, its decision must be conclusive as to the
whole subject.   If it has not, the decision is of no force.
The validity of the sale of the property of an American citi-
zen under an admiralty condemnation, turns upon the au-
thority of the court to fix, by its sentence, the character of
that property, in relation to the parties at war; and if such
authority is vested in the foreign court, with respect to one
party interested in the property, I perceive no solid reasons
why it should not extend to all the parties.

Besides, both the insurers and insured must be presumed,
when they entered into this contract, to have contemplated
the risk of capture at sea, and consequently of an admiralty
trial abroad, on the point of neutrality of the property insur-
ed; for in that view alone was the warranty of neutrality
material.   It is, therefore, fairly inferable, that the contract-
ing parties meant to refer the fact of neutrality to the
courts of the belligerents, where *the question of    [*454]

prize or not, was alone triable, in case of capture.   The assured not only stipulates that the property is neutral, but the spirit of his stipulation is, that he will maintain it to be so when examined before the foreign tribunal.   (8 Term Rep. 244, 444.   Millar, 466.)   He is, therefore an essential party to the proceeding in that court, and must be consider-ed as having assumed the risk of its decision on the point of neutrality.   To exonerate him from the consequences of that risk, at the expense o.' the underwriter, would, in my opinion, not only be unjust, but repugnant to the sound interpreta-tion of the policy.

In forming my opinion, I have dismissed all considera-tions of public policy.   1.  Because I deem them to be inad-missible in a court of justice, when called upon to pronounce the existing law of the land.   2.  Because the question be-fore us is simply, which of our own citizens shall bear the loss of property condemned for want of neutrality ; the party who guarantied its neutrality, or those to whom the guaran-ty was made ?   On the latter point, who can hesitate to say, that this court ought not to lend its aid to relieve a man from the consequences of his own warranty, to the prejudice of those for whose protection that warranty was contrived ?

Thus far I have proceeded on the true intent of the parties, as manifested by their contract ; I now pass on to what ap-pears to me to be the settled law on this subject.

In England, the conclusiveness of the sentence of foreign courts of competent jurisdiction, has been long since admit-ted, and confirmed, by a uniform train of decisions, in her highest courts of judicature.   The obligatory force of many of those decisions upon us, is not now to be controverted, be-cause it is established by the constitution which has adopted them as part of the common law.   ·

[*455]      *The sentences of admiralty courts appear to me to be of the number which are placed on that foot-ing.   Indeed the doctrine of conclusiveness applies, with peculiar force, to their sentences relative to prize, because their authority is bottomed on the general law of nations, which gives the right of capturing enemy's property on the

high seas, to belligerents. (Collect. Jurid. 101, 102, 106. Grotius, lib. 3, c. 2, s. 5. Vattel, lib. 2, s. 84, 85. Martens, 104, 105. 2 Ersk. Inst. 735.) This right necessarily involves the right of instituting courts, particularly adapted to try the legality of such captures. And hence it is, that we find courts of this description existing in all maritime nations, and embracing every where the same objects. They form a separate and independent branch of jurisprudence, uncontrolled by a common superior. Their mode of proceeding is appropriate, and variant from that of the common law courts. Hence it results, that the latter have neither the power to ascertain the merits of their sentences, nor of reviewing them.

An objection has been made, and 'was urged with considerable zeal, on the argument, that no direct authority on this point, is to be found in the English judicial proceedings, prior to our revolution. But on recurring to the English reporters and elementary writers, I find that objection is unfounded.

In 1681, in the cause of *Newland* v. *Horseman,* (1 Vernon, 21,) Lord Chancellor Nottingham declares himself explicitly in favor of the conclusiveness of foreign admiralty sentences.

In the case of *Hughes* v. *Cornelius,* in the reign of Charles II. the judges of the King's Bench laid down the rule in unqualified terms, that they were bound to notice the sentences of courts of admiralty abroad, and must not set them at large. (2 Shower, 242.)

In the tenth year of the reign of William III. Lord Holt, in an action on a policy of insurance, held, that if it appear upon the evidence, that the ship insured was seized and condemned by process of law, by the sentence *the property and ownership are destroyed, and [*456] there is no remedy on the policy. (1 Lord Raym. 724.)

The case from the Theory of Evidence, in 1761, bears directly upon the present question, and establishes the conclusiveness of a French admiralty sentence on the war-

ranty of neutrality, in a policy of insurance. (Theory of Ev. 37.)

The authority of the last case is fully confirmed by Judge Buller. (Buller's N. P. 243.) And I cannot discern whence it has been inferred, that he referred to the case of *Hughes* and *Cornelius*, for that was an action of trover, for an English ship, and the case he states is of a policy of insurance on a Swedish ship.

In the case of *Fernandes* v. *Decosta*, (Park on Ins. 178,) during the last French war, Lord Mansfield, in a similar case, adopts the same rule.

From those authorities, as well as the general course of decisions in the English courts, (Harg. 452, 457, 467, 471, 477, 479 ; 4 Co. 29 ; 7 Co. Litt. 3 ; 2 Lev. 14; 1 Freem. 83 ; Carth. 225; Amb. 761 ; 1 Salk. 290; 2 Bl. Rep. 977, 1175; 1 Show. 6; 1 Ld. Raym. 724 ; 2 Ld. Raym. 893 ; 2 Woodd. 456,) relative to domestic judgments, and the rules universally laid down by the most approved elementary writers, it appears incontrovertibly, that the conclusiveness of foreign admiralty sentences was received as settled law in England, before our revolution ; and being so, we are required by no less authority than the constitution of this state, to pronounce it to be the law here.

It may, perhaps, be asked, whether there is no remedy for our citizens against the unjust decisions of foreign vice-admiralty courts? To such an inquiry, I would answer in the affirmative ; for they have the same remedy against those sentences which foreigners have against the erroneous or unjust judgments of our own inferior courts ; an appeal to the higher tribunals, which are clothed with legal power to review, annul, and set them right. And this I take to be the true course which public policy and the general law of nations prescribe.

[*457] *Upon the whole, therefore, I conclude, 1. According to the sound construction of the policy, it was founded on a warranty of neutrality of the property insured. 2. That that warranty is conclusively falsified, by

Vandenheuvel v. The United Insurance Company.

the admiralty sentence of condemnation as enemy's property.

The result is, in my opinion, that the judgment of the supreme court ought to be affirmed.

CLINTON, Senator. The plaintiff having warranted a ship and cargo as American property, the question is, whether, in an action against the insurers, the sentence of a foreign court of admiralty, that a warranty was false, is conclusive evidence. It is admitted by the plaintiff, that the sentence binds and changes the property, and that it is *prima facie* evidence of the fact set up against him ; and on the other hand, it is conceded by the defendants, that in several cases, in an action of this kind, the judgment is not definitive in favor of the insurers ; such as when, on the face of it, it is founded on local ordinances, or contrary to the law of nations, or so ambiguous that the court cannot, from the reasons assigned, collect the grounds of it ; and, that this case not coming within either of these descriptions, the contest between the parties still remains open, whether the foreign sentence be *prima facie* or conclusive evidence, against the insured, and whether it bind the property adjudicated only, or is conclusive to every extent and in every modification of the subject.

Upon a question of such immense importance, either as it respects the interests of commerce, the honor of the nation, the rights of individuals, or the principles of justice, great and mature deliberation is requisite and essential. I know not any cause that has ever been discussed in this court which embraces so many objects, to render the final result important. Attempts have been made to establish the doctrine of conclusiveness ; and, as far as I can comprehend them, they may be arranged under four general heads.

*1st. Authorities previous to the 19th of April, [*458] 1775.

2d. Analogical reasoning from domestic courts.

3d. The nature and meaning of the contract of insurance ; and,

4th. National considerations of courtesy, comity, and the like.

The cases cited, as existing anterior to the revolution, are not only few, but are either ambiguous or not in point.

The most ancient one, reported in 2 Shower, of *Hughes* v. *Cornelius*, was an action of trover brought for a ship sold under a decree of a French admiralty court. The court admitted the sentence to be true, although contrary to the special verdict. They went upon the ground of the decree's changing the property, and of the inconveniences that would result to merchants, if the court should unravel the title of property acquired in this way; and the reason assigned by Chief Justice M'Kean, in a case reported in Dallas, (*Vasse* v. *Ball*, 2 Dallas, 271; see also 2 Dallas, 195,) seems to be conclusive. The idea that a sentence of a court of admiralty is conclusive, arises from the consideration that the court always proceeds *in rem.* The decree naturally and necessarily binds the subject of the proceeding. A ship or cargo, or any person purchasing under the decree, will, of course, be secure.

The next case relied upon, is a supposed one of a Swedish ship. It was first mentioned by an anonymous author, in a book entitled "Theory of Evidence." It does not appear in any collection of reports; and Buller, in referring to his authority for this, mentions the case in Shower. It, therefore, appears that it is confounded with the case of the Dutch ship in that author.

The case of *Fernandes* and *De Costa* was a Nisi Prius one, and it expressly states, that the plaintiff only gave a partial evidence of the vessel's being Portuguese; and all we can collect from it is, that the testimony adduced by him [*459] was not sufficient to balance that derived *from the foreign adjudication. Will it be believed, that upon this slender ground, the mighty fabric of conclusiveness is attempted to be erected? For, independent of decisions since the revolution, which are no authority; of arguments from analogy, which I shall presently notice; and of a few scattered *dicta* in the books, which do not bear the stamp of

judicial authority, there is nothing whereby to warrant the decision of the court below.

The arguments derived from the deference which is paid by the courts of England to each other's proceedings, do not apply. They are parts of the same building, held together by one common arch. They are under the same government, proceed according to the same law, and redress can be obtained through higher tribunals. If they attempt to exceed their jurisdiction, they can be restrained by a superior power which has an interest in preventing any undue encroachments, and repressing any improper deviations. This is not the case with a foreign court of admiralty. If a neutral conceives himself injured, and is indulged with an appeal, he must still continue in the court of the belligerent; and there is not any uniform law by which these courts govern themselves. They listen more to instructions from the sovereign, than to the injunctions of the law of nations. Lord Mansfield admits, that " in every war, the belligerent powers make particular regulations for themselves; and that no nation is obliged to be bound by them." (Park, 360,) It is conceded by the defendants, that a foreign sentence is binding if resting, on the face of it, on such regulations, and yet they declare, that if founded on these, but it does not appear to be so founded, that then it is conclusive.

With respect to the nature of the contract, upon which much has been said, I confess I do not perceive the force of the reasoning, which attempts to fix the loss on the insured.

*The contract of insurance, says Park, being for    [*460]
the benefit of the insured, and the advancement of
trade, must be construed liberally, for the attainment of those ends. We must, therefore, not give it an exposition that would tend to embarrass commerce, or injure the assured; but adopt such a construction as will most promote the important objects in view. How commerce would be affected, shall hereafter be considered. By the terms of the contract, the assured warrants the property to be neutral, and it is understood to be incumbent on him, so to conduct the vessel,

as not to forfeit her neutrality. If the vessel be neutral, in fact, he fulfils his warranty. He does not warrant that she shall be so in the conception of foreign courts. It is not in the reach of human sagacity, to scan the views which different men may take of the same subject, or the various motives which may produce clashing decisions. Against corruption or ignorance in judges, perjury in witnesses, and fraud in captors, it is out of the power of the assured to guard; they are risks which he casts upon the assurer, and which the assurer undertakes in consideration of an adequate premium. All the assured is required to do, is not to falsify his warranty. In this case he paid a war premium of 15 per cent; and, the foreign sentence out of view, the special verdict has verified his warranty.

With regard to the comity due from one national tribunal to another, it appears to me, that the compliment is carried sufficiently far, by considering the sentence as *prima facie* evidence. We are not bound to sacrifice the substantial interest of our citizens to etiquette or courtesy. If a foreign nation will countenance unjust spoliations, if a foreign judge will divide the spoil with the plunderer, are we to countenance the knave and the robber, and declare, with all possible politeness, " although we are convinced that an inquiry would paint you in these colors, yet, our respect for your authority, will prevail over a regard for justice, or [*461] the claims of our *citizens; we shall silence all discussion; and, although we know you both ignorant and corrupt, both oppressive and fraudulent, yet, as you wear the form, without attending to the obligations of a court of justice, we shall treat your decisions with all imaginable courtesy, comity, deference, politeness, and respect."

This is a summary of the doctrine, stripped of the imposing garb which it has assumed, and it can only be a question, whether it is most deserving of ridicule, or detestation.

In suits brought in England, upon foreign judgments, between the same parties, the courts consider them only as

Vandenheuvel v. The United Insurance Company.

*prima facie* evidence of the demand, and admit the defendant, on a plea of *nil debet*, to contest the merits of the original cause of action. If a foreign judgment be not considered conclusive between the same parties, in cases of this nature, why should the sentence of a foreign court of admiralty between third persons ? The constitution of the United States provides, that " full faith and credit shall be given in each state, to the public acts, records, and judicial proceedings, of every other state." And the congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof. Is it conceivable, that if the sentence of courts of disconnected nations are to be held in such high veneration, by each other, that the framers of the constitution could have thought it necessary to make this provision for sister states, in the closest bond of political connection.

The British have made the interests of commerce a primary object of their cares. In the discovery and arrangement of wise plans, and the execution of efficacious measures, for the attainment of this important end, they stand unrivalled in the history of mankind. Their fleets now traverse every clime, and visit every sea, laden with the riches of the world ; they bear in their hands the trident of the ocean. In the time of war, they enrich themselves with the plunder of neutrals ; *their courts appear [*462] every where, and condemnations are conducted, not according to the law of nations, or the rights of parties, but according to the instructions from the sovereign and the rapacity of the captors. " Much less," says Wooddeson, (2 Wooddes. 456,) " ought any of our courts to slight a foreign sentence. Unless we give credit to their proceedings, we cannot expect the judgments here should be thought to merit from them any reverence or attention." Here, then, is an explicit avowal that the doctrine is adopted with a view to a return. But France, having a different policy, has adopted a different system. (Emerigon, 457, 464.) It is to be further considered, that Great Britain is more than one-half her time at war ; that she is an underwriting nation, and,

therefore, highly interested in maintaining the rule laid .down. Our policy is entirely different. Peace is no less our interest than our duty. Our courts are not liable to executive instructions, and, consequently, must be governed by the principles of justice ; not according to the exigencies of the state. In establishing, therefore, a rule for our government on this momentous subject, *argumenta ab inconvenienti* ought to have great weight. France and England have set us an example ; and, as the law of nations is at least doubtful, we are at liberty to adopt such a construction as shall most subserve the solid interests of this growing country. We ought also to consider, that the object of insurance is indemnity ; that instead of fixing the loss upon one, it divides it among many ; that with a pacific nation like ours, a construction that will release the insurer from war risks, will be a deprivation of all the benefits that can arise from a neutral position, and will expose us to most of the calamities, without any advantages, derivable from a belligerent state.

Even Great Britain, situated as she is, has found inconvenience, in many respects, from the generality of the rule she has adopted. Her courts have, by recent decisions, attempted to narrow it into smaller compass. Several im-

[*463] portant exceptions have been sanctioned, and *when-ever a different course of policy shall be deemed advisable, the whole system will be destroyed. Our court has, unadvisedly, and in the first instance, without hearing argument, taken that direction ; and, with the best intentions, has persevered in a doctrine which would inevitably lead to the spoliation of our citizens, and the destruction of our commerce.

There is nothing, either in the constitution of the admiralty courts of European nations or the mode of proceeding in them, which entitle them to respect. They adopt the rules of the civil law. The judges hold their offices during pleasure, and follow the instructions of the ministry. The captors, who are interested, are admitted as witnesses, and the judges are paid in proportion to the condemnation.

They are generally composed of needy adventurers; their great aim is plunder, and their primary incentive, avarice.

I have thus, in a cursory manner, glanced at the principal grounds of reasoning in the cause, and I must own, that I feel most deeply impressed with its importance. The effects of the decision of this day, will be felt when we are no more; and I trust that it will receive the approving voice of our consciences, and of our country.

GOLD, Senator. The questions that arise in this cause for the consideration of the court, are:

1st. Does the warranty in the terms of the *good American ship, the Astrea*, import, in judgment of law, *American* or *neutral property?*

2d. Is the sentence of the vice-admiralty of Gibraltar *conclusive, and does it repel the verification of warranty here?*

On the first preliminary question, however loose and indefinite men are in conversation upon subjects of this nature, yet when the *occasion* is considered, the bearing of the *property of the ship* on the professed object *of [*464] the contract; its materiality to the risk, and consequent propriety of an understanding on the point, the court must, I apprehend, consider Mr. Vandenheuvel as explaining himself on the question of property, and under the terms *American ship,* warranting it *neutral.*

Such, in my apprehension, is the plain, fair and rational import of the language, used by the assured on this occasion.

On the second question in the cause, involving the legal effect of the sentences of foreign courts of admiralty, I enter with much diffidence, and all the solicitude which its extensive operation upon the fortunes of our fellow citizens, and the jurisprudence of our country inspires. If our law is settled on this point; if the question is bound by authority, then the law must have its course, however unpleasant the consequences, however opposed to the speculations of the most enlightened statesmen.

For authority on the question, adjudged cases in that

country from whence our jurisprudence is derived, antecedently to our revolution, must be resorted to.

The necessary effect of the sentences of foreign courts of admiralty, *in rem*, in changing the property in the subject matter, in case of condemnation, is readily evinced, both in point of reason and authority. To this the case of *Hughes* v. *Cornelius*, (2 Shower, 232,) strengthened by some other cases, bears strong testimony ; in this the jurisdiction of all courts of admiralty, and the peace of all civilized nations, are essentially concerned.

But the reason for extending those sentences beyond the attainment of the above objects, to control the stipulations of parties in a policy of insurance, are not equally cogent ; the necessity not equally apparent.

For authority to support this application of admiralty sentences are cited, Buller's N. P. 244 ; Theory of Evidence, 37 ; and the case of *Fernandes* v. *De Costa*, (Park, 177.) In the two first books, the rule to the above extent is laid down in nearly the same words ; in plain and unequivocal [*465] terms ; but no case is cited in the Theory *of Evidence in support of the doctrine, and in Buller, the case relied on is that of *Hughes* v. *Cornelius ;* which, although containing observations of the court of a very general and unqualified nature, yet, in the point adjudged, does not warrant the rule as there laid down.

The case of *Fernandes* v. *De Costa*, is apposite to the question before the court, and merits all that respect which is due to a N. P. decision of one of the greatest judges that ever sat in Westminster Hall. The name of Judge Buller must be considered also as adding some authority to the rule by him laid down, though supported by no adjudged case there cited.

No adjudications at bar, no elaborate discussions appear to have taken place on the question. On this foundation, in point of authority, stands the doctrine contended for by the defendants in error ; and we are now called upon to say, whether the question is so bound down by authority as

to be deemed at rest, and to repel a consideration of its merits.

After much reflection on the point, in every view I have been able to place it, I am not satisfied that the law on the subject was settled at the period of our revolution. In pursuing the history of law principles, in retracing adjudications, and collecting cases upon questions long agitated in courts, we find early cases often overruled; first opinions disregarded and reversed, and important questions finally settled in opposition to greater authority of precedent than what is to be found on the question before the court.

Such is the result presented by a perusal of English reporters.

But general principles are resorted to in support of the definitive effect of admiralty sentences, and domestic judgments are adduced for illustration.

In the principles of sovereignty, in the superior integrity and responsibility of domestic judges, their exemption from the influence of policy, from the dominion of *passions hostile to the administration of justice, too    [*466] often excited in belligerent nations, in the prevalence of the salutary maxim of municipal origin, " *ut sit finis litium,*" will be found reasons, I apprehend, for superior confidence in domestic tribunals.

The case of *Walker v. Witter*, (Doug. 5,) is strong to show the difference between domestic and foreign judgments; the incontrollable verity predicated of the former, is withheld from the latter, which are there holden to be *examinable*. Nor is the effect of this authority repelled by the argument, that a court resorted to, to carry into effect a foreign judgment, ought to be satisfied of its justice ; the application is for *justice*, and not *favor*, and the court thus resorted to is bound by constitutional principles, not to delay that justice ; besides, the same principle will apply to the case before the court.

The case of *Gage* v. *Bulkley*, in Ridgway, and *Burrows* v. *Jemino*, in Strange, are not considered as bearing on the question ; they rested on a different principle, that of the

"*lex loci contractus.*" The qualified manner in which admiralty sentences are now received in England; their different operations as to the *fact* and the *law*, serve to mark a wide distinction between those sentences and domestic judgments.

If the reasons assigned for an admiralty decision do not, when tested by the law of nations, bear out the conclusion, the sentence is rejected; if the reasons are assigned in an obscure and unintelligible manner, as to the *point decided*, the result is the same; but if the judge should have no reasons, or, by casualty, omit to put them on the record, then the sentence becomes conclusive, and repels all examination.

Why a sentence founded on *error as to facts*, should be more conclusive than one founded on *error in law*, is difficult to conceive. That the mode of admiralty trial is more favorable to the investigation of truth than that provided by our common law, is not, I apprehend, [*467] *evinced by experience, nor do the opinions of some very eminent writers warrant any such conclusion.

To sentences standing on such grounds, my mind is not yet reconciled to yield that controlling effect now contended for. Nothing short of the law being made out in the clearest and most satisfactory manner, can, in my apprehension, justify the reception of those sentences, upon the broad ground now urged upon the court.

There is another ground remaining to be considered, on which it is with some difficulty I have been able to form an opinion.

The position of the insurer is, *that the insured, on entering into the policy, well knows the tribunal of the captors to be the prize-forum ;* that a consideration of neutrality is essential to the determination; and, therefore, by the terms of his contract, assents to this test of his warranty. If the law, giving a conclusive effect to admiralty sentences, is to be deemed settled, then would the above conclusion correctly follow; then would the assured be presumed to know *that*

Vandenheuvel v. The United Insurance Company.

*law*, and to assent by his contract to all its consequences; but, upon any other ground, he may with equal reason be presumed to assent to a limited operation of these sentences, as *prima facie*, or presumptive evidence, reserving to himself a right, and taking upon himself the burthen of disproving the same, and verifying his warranty. Such must be the conclusion of the assured in France.

A mind conscious of the truth of the representation in the policy, would with difficulty be carried to the conclusion, that although the property insured be, in fact, neutral, yet, if condemned it must therefore be deemed enemy's. Where the property, in fact, is neutral, and in such case only, will the above opinion operate; it is not to be presumed, that the assured calculates on the event of a condemnation. In the various cases of loss by any of the perils insured against, the falsification of the warranty, is equally fatal to a recovery by the assured, *though no foreign admiralty   [*468] may have passed upon the question.

Such are the grounds on which my opinion on this important question is formed. I will only add, that it is with no small diffidence I submit an opinion for the reversal of the judgment of a court, possessing, in so eminent a degree, the high respect and confidence of the community.

The majority of the court being of the same opinion, it was thereupon ORDERED and ADJUDGED, that the plaintiff in error recover, as for a total loss, the amount found by the jury in the special verdict, with interest and costs, and that the judgment of the supreme court be reversed, and the record remitted, &c.

Judgment of reversal.(a)(b)

(a) [Old note.] Since the decision of the above cause, several cases have arisen in the courts of Great Britain and the United States, in which the question as to the effect and conclusiveness of the sentences of foreign courts of admiralty, has been variously considered and determined. (See Marshall on Insurance, 2d ed. p. 420, 436. Park on Insurance, 6th ed. p. 463, 497. And see *Geyers* v. *Aguilar*, 7 Term Rep. 681. *Christie* v. *Secretan*, 8 Term

(b) See *supra*, vol. 1, p. 16, n. (a,) and vol. 2, p. 16, n. (b); 144, n. (b.)

Vos and Graves v. The United Insurance Company.

[*469]     *ANDREW VOS AND JOHN B. GRAVES, *Plaintiffs*
           *in Error*, against THE UNITED INSURANCE
     COMPANY, *Defendants in Error.*(a)

Sailing for a port understood to be blockaded is not a breach of neutrality, so
     as to affect the warranty in a policy of insurance.

THIS cause came before the court on a writ of error from
the supreme court. For the facts in the cause, and the opi-
nion of the court, see *ante*, pp. 180—191.

Rep. 192.     *Garrells* v. *Kensington*, 8 Term Rep. 230.     *Pollard* v. *Bell*, 8
Term Rep. 441.     *Bird* v. *Appleton*, 8 Term Rep. 562.     *Price* v. *Bell*, 1 East's
Rep. 663.     *Oddy* v. *Bovil*, 2 East's Rep. 473.     *Baring* v. *Claggett*, 3 Bos.
& Pull. 201.     *Lothian* v. *Henderson*, 3 Bos. & Pull. 499.     *Bolton* v. *Glad-
stone*, 5 East, 155.     *Baring* v. *Christie*, 5 East, 398.     *Baring* v. *Royal Ex.
Ass.* 5 East, 99.     *Fisher* v. *Ogle*, 1 Camp. N. P. Cases, 418.     ¨*Donaldson*
v. *Thompson*, 1 Campb. N. P. Cases, 429.     *Kinderley and others* v. *Chace
and others*, in Park, 486, and Marshall, 423.)

The result of the decisions in the English courts seems to be that where
property is warranted neutral, and the court of the belligerent country con-
demns it as belonging to an enemy, the sentence, however absurd, is conclu-
sive evidence that the warranty is false ; but where the belligerent country
condemns as prize, without adverting to the question of neutrality at all, it
does not operate on the truth or falsehood of the warranty, or a fact asserted
in the policy of insurance.

How reluctantly this doctrine, as to the conclusiveness of foreign sentences,
has been acquiesced in by some of the judges of the English courts, may be
seen from the expressions of Lord Ellenborough, in the cases of *Fisher* v.
*Ogle* and *Donaldson* v. *Thompson*, where he says, " it is by an overstrained
comity, that these sentences are received as conclusive evidence of the facts
which they positively aver, and upon which they specifically profess to be
founded.

" I am by no means disposed to extend the comity, which has been show-
ed to these sentences of foreign admiralty courts. I shall die, like Lord Thur-
low, in the belief that they ought never to have been admitted.     The doc-
trine in their favor rests upon an authority in Shower, (vol. 2, p. 233, *Hughes*
v. *Cornelius*,) which does not fully support it, and the practice of receiving
them, often leads, in its consequences, to the greatest *injustice.*"     In a *ga-
zette* report of the case of *Donaldson* v. *Thompson*, Lord Ellenborough is sta-

(a) S. C. 1 Caines' Cas. in Error, vii.

\*VAN VECHTEN, Senator.   Two questions present   [\*470]
themselves to my mind, as material for our consider-
ation in the· present case.

ted to have said, " that he should always hold the authorities of foreign
courts to condemn ships as prize, to the utmost strictness of proof, when of-
fered as evidence to affect the rights of third parties, in a court of justice of
this country: that there were some of the most enlightened minds in the
country, who thought that these sentences of foreign courts ought never to be
received in evidence at all on such occasions; that Lord Thurlow never met
him without saying so : his mind was full upon it; he said it was an *anomaly*
in the law, and ought never to have been allowed to have crept into it ; and
that he agreed with Lord Thurlow upon that subject, and he should die in the
faith ; but the usage of nations, perhaps, required, certainly authority had de-
cided, that these sentences should be received in evidence, and be conclusive
on all things on which they operated ; a doctrine, to give way to which, was
sufficiently painful in many instances, but he should never consent to extend
it an *iota* beyond the letter."

In *Vasse* v. *Ball*, (2 Dall. 270,) decided in the supreme court of Pennsyl-·
vania, in 1797, where the property was warranted· neutral, and the libel sta-
ted several grounds of forfeiture, and the sentence of condemnation was ge-
neral, without specifying any particular cause of forfeiture, the court held that
the assured, notwithstanding the sentence, might show that the property was
American.

In the case of *Dempsey, Assignee of Brown*, v. *The Insurance Company
of Pennsylvania*, decided in the high court of errors and appeals, in the state
of Pennsylvania, (in 1808,) it was held, after two arguments, that " the sen-
tence of a foreign court of admiralty was conclusive, not only as to its direct
effects, but also as to the facts directly decided by it ;" Judges Rush, Ro-
berts, Hamilton, Young and Wilson, in the affirmative ; Judge Cooper, con-
tra. (1 Binn. Rep. 299, n.) See also *Colhoun* v. *Ins. Co. of Pennsylvania*,
1 Binn. Rep. 293, and *Galbraith* v. *Gracie*, in the circuit court of the United
States, 1 Binn. Rep. 293, note.

The legislature of Pennsylvania, by an act of the 29th of March, 1809,. de-
clared that no sentence of any (foreign) court, having or exercising jurisdic-
tion of prize, shall be conclusive evidence in any case, of any fact, matter or
thing, therein contained, except of the acts of such court ; provided, that
nothing in the act shall be construed to impair or destroy the legal effects
of such sentence on the property affected, or intended to be affected
thereby, &c.

In the case of *Rose* v. *Himely*, (4 Cranch's Rep. 241,) the supreme court
of the United States decided, that a sentence of condemnation, by a compe-
tent court, having jurisdiction over the subject matter of its judgment, is
conclusive as to the title of the thing claimed under it.   Chace, J. and Living-
ston, J. dissenting.   And in *Croudson and others* v. *Leonard*, (4 Cranch, 434,)
which was an action on a policy of insurance, the supreme court of the

United States, (February, 1808,) held, that the sentence of a foreign court of admiralty, condemning a vessel for breach of a blockade, was conclusive evidence of that fact, as between the insurer and the insured. Marshall, Ch. J., Cushing, J., Washington, J. and Johnson, J. in the affirmative. Chase, J, and Livingston, J. contra. Todd, J. not having heard the argument, gave no opinion. Washington, J. and Johnson, J. were the only judges who appear to have stated the reasons for their opinions. (See also *Fitzsimmons* v. *Newport Ins. Co.* 4 Dallas, 185.)

The same question was lately brought before the supreme court of Massachusetts, but the result is not known.