<div align="right">NEW-YORK,
Oct. 1812.

RADCLIFF
v.
UNITED INS.
Co.</div>

———⚹⊕⊛———

## J. RADCLIFF AND OTHERS *against* THE UNITED INSURANCE COMPANY.

## SAME *against* SAME.

THESE were actions on two policies of insurance on the brig *William Tell*, and her cargo, dated 6th *December*, 1807, " at and from *New-York* to *St. Lucar*." On a former trial of this cause, a verdict was found for the plaintiffs, which was set aside, and a new trial granted, chiefly for the misdirection of the judge. (See 7 *Johns. Rep.* 38—57.)

The cause was again tried, at the sittings in *New-York*, on the 21st *December*, 1811, before Mr. Justice *Van Ness*. The evidence, on the second trial, was nearly the same as that given on the first. The additional evidence consisted of an explanatory deposition by *Thomas Holden*, the master of the brig ; and by *Jabez Lovett*, master of the *Connecticut*. Two other witnesses were examined ; *Joseph P. Manny*, on the part of the plaintiffs, and *Samuel Lyle*, on the part of the defendants.

*Holden* stated that by the words " the fleet off *Cadiz*, or before *Cadiz*," or similar words, used in his former deposition, he did not mean to describe the actual position of the fleet alluded to, but merely to designate the fleet itself, about which he was speaking. That when the lugger and the prizes joined the fleet, which was about 48 hours after the capture of the *William Tell*, the fleet

<div style="float:right; width:30%;">A policy of insurance contained a clause, that *the insurers took no risk of blockaded ports*. It was held, that if there was a blockade in fact, whether the capture on that account, was legal and just, or not, it came within the exception of the risks of a blockaded port. Where the sentence of condemnation is directly on the ground of a breach of a blockade *de facto*, it is *prima facie* evidence of the fact of such blockade; and it is not enough that the jury have doubts as to</div>

the existence of the blockade at the time of the capture, to authorize them to find a verdict for the plaintiff. *St. Lucar* was, in fact, blockaded on the 27th *January*, 1808.

lay off *Cape Spartel*, but the reason of its being there he did not know. The weather, previous thereto, had been moderate and pleasant, and the wind very light. The lugger having placed the prize under the charge of the fleet, did not continue with it more than an hour and a half, but proceeded for *Gibraltar*. About 30 hours after leaving the fleet, the lugger encountered a considerable storm, which drove her on the *Barbary* coast, and obliged her to put into a port there, to repair. He never heard of the blockade of *St. Lucar*. When the lugger, after the capture, joined the fleet, the witness could not see land, nor could he tell how far it was distant from *Cape Spartel*, nor how *Cadiz* bore from the fleet.

*Jabez Lovett*, master of the ship *Connecticut*, deposed, that shortly after he passed *Cape St. Mary's*, he was chased by two frigates; that they could not know, from the course he was steering, whether he was going to *Cadiz* or *St. Lucar*. After he altered his course, to run into *St. Lucar*, the frigates endeavoured to cut him off, and chased him, until he came to anchor, under the guns of the fort at *St. Lucar*; that when he arrived there, on the 4th of *February*, 1808, he understood *St. Lucar*, as well as *Cadiz*, was blockaded, and had been so for some time before; that he continued there two months, during which time, and when he left it, it was universally understood to be blockaded. The blockading squadron might be seen daily, and he saw it twice; that when he came out of *St. Lucar*, he saw 24 sail of the squadron; he escaped them in the night. The distance from *St. Lucar* to *Cadiz* is 25 miles by water, and 15 miles by land. Cargoes landed at *St. Lucar* may be easily transported to *Cadiz* in boats along the shore. The squadron blockading *Cadiz*, would necessarily blockade *St. Lucar*, if it was intended to be blockaded. He undertook the voyage to *St. Lucar* on the information of his brother, *James Lovett*, at *St. Lucar*. Before he left *New-York*, he heard that *Cadiz* was blockaded, but not *St. Lucar*.

The letter of Mr. *Canning*, dated 8th *January*, 1808, which was read in evidence, stated, " that his majesty had adjudged it expedient to establish the most rigorous blockade at the entrances of the ports of *Carthagena, Cadiz* and *St. Lucar*, and all the intermediate ports between *Carthagena* and *St. Lucar*."

*Richard Bayley*, a witness for the defendants, testified, that he was at *Cadiz* from the last of *October*, 1807, to *March*, 1808;

NEW YORK,
Oct. 1812.

RADCLIFF
v.
UNITED INS.
Co,

that he understood, from the general report and understanding, when he arrived there, that *Cadiz* and *St. Lucar* were blockaded. The same fleet could blockade both ports, if that was intended. Vessels not having provisions were sometimes permitted to enter *Cadiz;* but vessels with provisions were turned away. Provisions were carried along shore from *St. Lucar* to *Cadiz.* He kept his cargo for a rising market, in consequence of daily hearing that both ports were blockaded. The cruising ground of the squadron, as he was informed, was from *Cape Spartel* to *Cape St. Mary's.* The blockade began to be more rigorous some time in *January.* Some new orders arrived at *Cadiz,* from *England,* in *January,* after which the blockade was more rigorously enforced. The usual passage for a despatch vessel from *Portsmouth* to *Gibraltar* was from 8 to 12 days. He understood, at *Cadiz,* that it was the practice of the blockading squadron to keep small vessels off *Cape St. Mary's;* he saw only a gun brig when he entered, but was not hailed by her, though within a sufficient distance for that purpose.

*Joseph P. Manny* testified, that he arrived at *Cadiz* about the 22d of *September,* and left it about the 22d of *November,* 1807, at which time *St. Lucar* was not considered in a state of blockade. He was warned by an *English* cruiser not to go to *Cadiz,* and was told he might go to any other port in *Spain.* He went to *Algesiras,* and transported his cargo, coastwise, to *Cadiz.* The distance between the two places is about 120 miles. A good passage from *England* to *Cadiz* is 15 days; it has been made in 8 days; though it usually takes a longer time. The usual passage would be 20 days. The same squadron would blockade both *Cadiz* and *St. Lucar,* if both were intended to be blockaded.

*Samuel Lyle* testified, that in a voyage from *New-York* to *Cadiz* and *Algesiras,* he was boarded, about the 20th *November,* 1807, between *Cape St. Vincent* and *Cape St. Mary's,* by an *English* gun brig, and warned not to go into *Cadiz* or *St. Lucar,* as they were blockaded; and, in consequence of this warning, he went to *Algesiras,* where he understood that both *Cadiz* and *St. Lucar* were blockaded. He went by land from *Algesiras* to *Cadiz,* where he arrived between the 1st and the 10th of *February,* 1808, and where he also understood that *Cadiz* and *St. Lucar* were blockaded, and that the blockade was more rigorous in consequence of some new orders from *England.*

A witness testified, that an ordinary passage from *Falmouth* to

*Cadiz,* for a government packet, was from 8 to 12 days. Twenty days would be a long passage in winter ; 15 days, at that season, would be a fair allowance.

Several witnesses testified, that when the *William Tell* left *New-York,* it was not known, or supposed, that *St. Lucar* was blockaded. The *William Tell* was captured in the regular track to *St. Lucar.*

The judge charged the jury, that if *St. Lucar* was blockaded in fact, and the *William Tell* had approached within the cruising ground of the blockading squadron, at the time of her capture, they ought to find for the defendants, whether the capturing vessel belonged to the squadron or not ; but that if *St. Lucar* was not blockaded, and if the blockade, at the time of the capture, had been voluntarily raised, or suspended, or if the *William Tell* had not reached the cruising ground, they ought to find for the plaintiffs ; that the mere blowing off of the blockading squadron, if they resumed their station with due diligence, would not be a raising or suspension of the blockade, in the mean time ; that the defendants must bring themselves within the exception in the policy ; and that if the proof was not satisfactory that *St. Lucar* was blockaded, on the 27th of *January,* 1808, or if the jury had doubts on that point, they ought to find for the plaintiffs.

The jury found a verdict for the plaintiffs ; and being asked by the counsel of both parties, if they found for the plaintiffs on the ground that *St. Lucar* was not blockaded, they answered in the affirmative.

A motion was made, by the defendants, for a new trial ; 1. Because the verdict was against evidence ; 2. For the misdirection of the judge.

The cause was argued by

*Hoffman* and *Wells,* for the defendants.

*P. W. Radcliff* and *Van Vechten,* for the plaintiffs.

KENT, Ch. J. delivered the opinion of the court. The motion for a new trial is made upon two grounds ; 1. That the verdict is against evidence ; and, 2. That the judge misdirected the jury.

1. The first point is open for a free consideration, notwithstanding a new trial has been once granted in this cause. The verdict was formerly set aside for misdirection. That was the main

ground of the opinion of the court, and the jury gave the first ver- <span>NEW YORK,</span>
dict in pursuance of the direction of the court on a point of law, and <span>Oct. 1812.</span>
without giving themselves any time to deliberate upon the question <span>RADCLIFF</span>
of fact of the existence of the blockade. That question was, in <span>v.</span>
this last trial, for the first time, submitted to the jury, and delibe- <span>UNITED INS.,</span>
rately passed upon by them. <span>Co.</span>

The question is, whether *St. Lucar* was, at the time of the cap-
ture, a blockaded port, within the exception in the policy. This
is a matter of fact, depending on a contract between our own citi-
zens. It has nothing to do with any conflict between belligerent
and neutral pretensions. It does not necessarily involve any exa-
mination into the just extent of these pretensions. It is a plain in-
quiry into the existence of a fact, viz. was here a loss chargeable
to the existence of a blockade? A blockade may exist in fact,
and yet a capture and condemnation for the breach of it be unjust,
from the want of knowledge in the neutral of the existence of the
blockade. This case, then, need not, and ought not, to awaken
any prejudice, or bias, one way or the other, as respects the object
of the present suit; and there are no considerations which ought
to have induced a jury to require more strict evidence of this,
than of any other ordinary question of fact.

The court have already decided that the legality of the cap-
ture was not the question in the case. Admitting the capture and
condemnation to have been illegal, from the want of due proof of
notice, yet, if the loss arose by reason of the port of *St. Lucar* be-
ing blockaded, it falls within the exception.

There may be a blockade of a port in fact, unaccompanied with
a previous notification to neutral nations; and, therefore, a vessel
arriving within the cruising ground of the blockading squadron, and
bound to the blockaded port, in ignorance of the blockade, would,
in the first instance, be entitled, of right, to a notice to depart, and not
subject to capture and condemnation; yet, if the latter alterna-
tive should be adopted by the belligerent, either from a disregard
to right, or from an overstrained application of the doctrine of con-
structive notice, the loss would still be on account of the blockade.
It would be to be classed among those *risks of a blockaded port*
which the insurer did not, in the present instance, assume. And
in cases of blockade, attended with a general notification to neu-
trals, it does not necessarily follow that the blockade did not exist
in fact, at or before the promulgation of the notice. It may exist
*de facto*, at the date of the notice. There is nothing inconsistent
or unusual in this. The notice to the neutral governments is given

NEWYORK, to put their subjects and citizens upon their guard, and to fix, after-
Oct 1812. wards, with more facility and certainty, the *delictum* upon the
RADCLIFF neutral who is seized in the act of violating, or attempting to vio-
v. late, the blockade. Thus, for instance, the notification of the
UNITED INS. blockade of *Genoa* was announced by the *British* government on
Co. the 20th of *February*, 1801, as then existing, and that it had ex-
isted from the 5th of *January* preceding. (3 *Rob. Adm. App.* p.
44.)· So in the case before us, it is to be inferred, from the letter
of Mr. *Canning*, of the 8th of *January*, that the blockade of *St.
Lucar*, and of the other ports referred to, was then actually exist-
ing. If the letter was to be considered as establishing the fact
that *St. Lucar* was not then in a state of blockade, it would equal-
ly go to prove that *Cadiz* was not also, at that time, blockaded,
though, from the plaintiffs' testimony, in this case, it appears that
*Cadiz* was in a state of blockade for months before. The notice
given by Mr. *Canning* referred to an extended line of the *Spa-
nish* coast, embracing many ports besides *St. Lucar;* and it is by
no means to be inferred from that notification, that no single port,
within that line, was previously in a state of blockade.

The evidence of a blockade of *St. Lucar* existing *de facto*, at
the time of the capture, consisted of the following *items:*

1. The sentence of condemnation, which proceeded directly on
the ground of that fact; and this sentence is *prima facie*, though
not conclusive, evidence of the fact of the blockade. This effect of
the foreign sentence was conceded by the counsel, and the court,
upon the final decision, in the court of errors, of the greatly litiga-
ted question touching the conclusiveness of foreign sentences. (2
*Johns. Cas.* 451.)

2. The affidavit of Captain *Jabez Lovett*, who was chased into
*St. Lucar*, on the 4th of *February*, 1808, by two *British* fri-
gates. When he arrived, he understood that *St. Lucar*, as well
as *Cadiz*, was blockaded, " and had been so for some time be-
fore." And while he continued at *St. Lucar*, which was two
months, it was universally understood to be blockaded, and the
blockading squadron was to be seen almost daily.

3. The testimony of *Richard Bayley*, who was at *Cadiz* from
*October*, 1807, to *March*, 1808. He says, that when he arrived,
and while he continued there, he understood, from general report
and understanding, that *Cadiz* and *St. Lucar* were both blocka-
ded. *St. Lucar* is only 15 miles from *Cadiz*, and he had no doubt
of the fact from daily observation; and the same squadron would
blockade both ports, if both were intended to be blockaded. The

cruising ground of the squadron was from *Cape Spartel* to *Cape* 
*St. Mary's.*

4. The testimony of *Samuel Lyle* states, that he was boarded 
by a *British* gun brig, between *Cape St. Vincent's* and *Cape St.* 
*Mary's,* between the 15th and 20th of *November,* 1808, and warn-
ed not to go to *Cadiz,* or *St. Lucar,* as both were blockaded; 
that he went to *Algesiras,* and there distinctly understood that 
both *Cadiz* and *St. Lucar* were blockaded; that he arrived by 
land at *Cadiz,* between the 1st and 10th of *February,* 1808, and 
there understood the same thing, and that the blockade was lately 
more rigorous, in consequence of new orders.

It is difficult to resist the force of this mass of direct and posi-
tive testimony, arising not only from the sentence of the vicead-
miralty court, but from persons who acquired their information at 
the time, either by the act of warning of the belligerent cruiser, or 
from their own observation, and the testimony of the *Spaniards* 
themselves, at the very places blockaded.

The testimony on the other side, to prove the non-existence of 
the blockade, consists of the following *items :*

1. The testimony of Captain *James Lovett,* who left *Cadiz* the 
last of *October,* 1807. He says that *St. Lucar* was not then consi-
dered as blockaded.

2. The testimony of *Joseph P. Manning,* who left it the 22d 
of *November,* and he says that *St. Lucar* was not then considered 
as blockaded.

3. and 4. The affidavits of the captain and mate of the *Wil-
liam Tell,* in which they state the capture on the 27th or 28th of 
*January,* 1808, off *Cape St. Mary's ;* that they were sent to *Gib-
raltar,* and that, at the time of the capture, *St. Lucar* was not, as 
they understood, considered to be blockaded.

There were some contradictions and explanations in the affida-
vits of the captain and mate, as to the position of the blockading 
squadron, and the state of the weather, which need not now be ex-
amined ; for, assuming that they have been sufficiently explained, 
they do not relate to the point now under consideration.    There 
is no pretence that the blockade, if it had previously existed, had 
been voluntarily raised at that time, by the departure of the fleet.

This testimony, offered in denial of the blockade, does not con-
tradict, or deny, any material facts alleged by the witnesses on the 
part of the defendants. It is of a negative nature, and cannot 
countervail the positive testimony of witnesses, who spoke from

NEWYORK,
Oct 1812.

RADCLIFF
v.
UNITED INS.
Co.

what they saw and heard at the places invested. Taking the testimony together, and making a just analysis and comparison of it, the existence of the blockade appears to be conclusively established.

The verdict is, therefore, decidedly against evidence.

Nor do I apprehend that the charge of the learned judge was altogether correct, when he told the jury that if they had doubts whether *St. Lucar* was blockaded on the 27th of *January*, they ought to find for the plaintiffs. If the plaintiffs had, in the first instance, made out their demand with certainty, and the matter set up in avoidance had been uncertain, then, undoubtedly, the plaintiffs ought to have prevailed; as, if a suit be on a bond, which is proved or admitted, and the defence of payment, or a release, is not made out clearly, the certainty of the demand ought to prevail over the uncertainty of the defence. But this principle is not applicable to the case. The plaintiffs did not make out their demand, in the first instance, with any certainty. If they had stated, and shown, a clear loss by sea perils, it would then have lain with the defendants to have brought themselves within the exception. But here, their very testimony involved the question whether there was not a loss by blockade, and especially as the sentence of condemnation was part of the plaintiffs' case, and introduced as annexed to, and forming part of, the affidavit of the captain of the *William Tell*. This is not a case, then, of a defendant setting up matter in avoidance of a demand which, of itself, is clear and certain. In making their demand, the plaintiffs raise the discussion of the very *gist* of the controversy, as much as if they had brought an action of trespass for an assault; and then the other rule of evidence applies, that if the right of recovery be uncertain and doubtful, the jury ought to lean against the plaintiff. But the true question here is, on which side did the weight of testimony materially preponderate, and not whether there were no doubts on the case. That rule would be too severe and rigorous, and would, in most cases depending on matters of fact much litigated, leave a defendant in hopeless despair. It can never apply (if it ever is to be applied) but to cases in which the plaintiff's right of action is, *per se*, absolutely certain, and is only to be defeated by other special matter set up in avoidance, or justification.

The verdicts, therefore, in these two causes ought to be set aside, and new trials awarded, with costs to abide the event of the suits.

<div align="right">New trial granted.</div>