NEW-YORK,
Nov. 1810.

RADCLIFF
v.
UNIT. INS. Co.

RADCLIFF and others *against* THE UNITED INSURANCE COMPANY.

THE SAME *against* THE SAME.

*A vessel and cargo were insured from New-York to St. Lucar. The policies contained the following clause: "The insurers take no risk of a blockaded port; but if turned away, the assured to be at liberty to proceed to a port not blockaded."*

*The vessel sailed from New-York, the 23d December, 1807. On the 27th January, 1808, she was captured by a British armed brig off Cape St. Mary's, on the coast of Portugal, about 70 or 80 miles from St. Lucar, and about 2 leagues from the shore; and was sent to Gibraltar, and condemned in the vice-admiralty court there, as lawful prize, "for having violated the blockade of the ports of Cadiz and St. Lucar, &c.*

THESE were actions on two open policies of insurance; one on the vessel, and the other on the cargo, of the brig called the *William Tell*, dated 16th *December*, 1807, " at and from *New-York* to *St. Lucar*." The policies. contained the following written clauses : " Warranted *American* property; proof whereof, if required, to be made here only. In case of capture or detention, not to abandon in less than six months after advice thereof at this office, or until after condemnation. The insurers take no risk of a blockaded port; but if turned away, the assured to be at liberty to proceed to a port not blockaded; but not to be liable to loss by seizure or detention at the port of destination, nor in consequence of the captain, crew, or any part of them, being impressed or taken out of the vessel, nor for the effects of the embargo. Also warranted, that the importers of the cargo, are not the exporters."

On the 6th *July*, 1808, the plaintiffs abandoned for a total loss.

The cause was tried at the *New-York* sittings, on the 6th *June*, 1810, before Mr. Justice *Yates*. No objection was made to the preliminary proofs.

*It was held, that the clause in the policy extended to every loss happening by reason of a blockaded port, whether such blockade was a strictly legal blockade or not; and that the insurers were not liable.*

*Notice, either actual or constructive, of the existence of a blockade, is requisite, before a neutral can be deemed in delicto, or to have violated his neutral duty.*

*What constitutes a lawful blockade?*

*There was a blockade in fact of Cadiz and St. Lucar, in January, February and March, 1806.*

*It seems, that the accidental and temporary dispersion of a blockading squadron, by a storm, is not a suspension of the blockade, provided the fleet uses all due diligence to resume its station.*

The deposition of *Henry Jakeways*, the master of the *William Tell*, was read in evidence. He testified as follows: The vessel sailed on the voyage, the 23d *December*, 1807, with a cargo of provisions, tobacco and staves. On the 27th *January*, the brig was captured by the *British* armed brig, the *Imogene*, off *St. Mary's*, on the coast of *Portugal*, about 70 or 80 miles from *St. Lucar*, and about two leagues from the shore. Until the capture, the brig had met no vessel during her voyage. The master went on board of the *Imogene* with his papers, and the captain of the *Imogene* declared him good prize, and put three of the crew on board of a *British* lugger, passing for *Gibraltar*, and the prize was also put under charge of the lugger, to go to the fleet off *Cadiz*, for convoy to *Gibraltar*. At the time of the capture, the *British* fleet intended for the blockade of *Cadiz*, was from 90 to 100 miles off; and if the *William Tell* had proceeded to *St. Lucar*, they would not have approached but a few miles nearer the squadron, as the same was then blown on the coast of *Barbary*, and as the course of the *William Tell* to *St. Lucar*, would have been nearly east.

The *William Tell* joined the blockading squadron, under the command of admiral *Purvis*, on the coast of *Barbary*, about 9 leagues from cape *Spartel*, and after remaining three or four days with the fleet, she was sent to *Gibraltar*, where she arrived the 9th *February*, 1808; and after performing quarantine for 10 days, the brig and cargo were libelled on the 22d *February*, and on the 7th *March*, were condemned in the vice-admiralty court at *Gibraltar*, as good and lawful prize. The following parts of the captain's deposition, which were read, were objected to, but admitted by the judge.

" That on the trial of the *William Tell* in the vice-admiralty court, the king's proctor read a letter which he said he had received a day or two before from admiral *Purvis*, in which the admiral stated his opinion, that

neutral vessels bound to *St. Lucar*, were liable to cap-ture, and it ought to be presumed, that they intended to go to *Cadiz*, or words to that effect; and that the deponent applied for a copy of the said letter, which was refused."—" That before his vessel was condemned, the deponent was present in the vice-admiralty court, at the trial of the brig *Calista* of *Boston*, which, it was proved and admitted, sailed from *Alexandria* in the *United States*, for *St. Lucar*, and had there disposed of her cargo, consisting chiefly of flour and tobacco, and taken in a return cargo, and was returning to *Boston*, when she was captured, in *January*, 1808; and that the brig and her cargo were acquitted, and restored to the claimants, about three or four weeks before the condemnation of the *William Tell*."

. The captain further deposed, that at the time of the capture, the port of *St. Lucar* was not considered as blockaded in fact; that, as he understood, *American* vessels freely entered and sailed from that port; that he saw or heard of no blockading force before *St. Lucar;* and he was informed, and always understood, that the blockade of *Cadiz* was principally, if not wholly, to keep in and watch the combined fleets there. That the place of rendezvous for the *Imogene* was at *Gibraltar;* that the *William Tell* was bound to *St. Lucar*, and to no other port. That while the deponent was at *Gibraltar*, he read a proclamation, issued by the governor of *Gibraltar*, dated the 10th *January*, 1808, giving notice, that the ports of *Spain* were blockaded, from *Cadiz* to *Carthagena* inclusive; that the captain of the *Imogene* told him, that he captured the *William Tell* under the orders in council of 1805.

The deposition of *Thomas Holden*, mate of the *William Tell*, was also read; which contained substantially the same facts as were stated by the master. He stated, " that at the time of the capture, the *William Tell* was between 90 and 100 miles from the fleet off *Cadiz;* that

if they had proceeded to *St. Lucar*, they would have approached nearer the blockading squadron before *Cadiz;* but how near, or what distance *St. Lucar* is from *Cadiz*, he did not certainly know; that the deponent and three seamen proceeded in the lugger, in company with the *William Tell*, until they came up with the fleet off *Cadiz*, and the *William Tell* was there put in charge of some other vessel; that the deponent and the three seamen went in the lugger for *Gibraltar*, and soon after met with a violent storm, which drove them on the coast of *Morocco;* that a number of vessels were lost in the storm, and that the lugger did not reach *Gibraltar* until about 36 days after the capture of the *William Tell;* that he did not see or hear of any blockading squadron before *St. Lucar*, but that port was understood not to be block-aded; that *American* vessels freely entered and returned from *St. Lucar*, and among others, the ship *Connecticut*, which sailed from *New-York* a few days before the *William Tell.*

*James Lovett,* master of the ship *Connecticut*, was produced as a witness, and his testimony, though object-ed to, was admitted. He went into *Cadiz* in the *Connec-ticut*, in *September*, and came out in *October*, 1807, un-molested. He carried in a cargo of provisions. He saw the *British* fleet off *Cadiz* when he went in; and that *Cadiz* was considered as blocakded, when he went in, while he was there, and when he left it. On coming out, in passing through the fleet, he was boarded, and asked what cargo he had carried in; and he answered, that he had carried in provisions, on which he was al-lowed to proceed. While he was at *Cadiz*, a number of *American* vessels were turned away, and several others, after being boarded, were permitted to pass. The blockade was not considered as excluding all commerce, but as being intended only to prevent the *French* and *Spanish* fleets from being supplied, which had returned after the battle of *Trafalgar*. That from the best information,

NEW-YORK,
Nov. 1810.

RADCLIFF
v.
UNIT. INS. Co.

he was satisfied that *St. Lucar* was not blockaded, at the time, nor so considered, while he was at *Cadiz;* and that immediately on his return to *New-York*, the *Connecticut* was despatched with a cargo of provisions for *St. Lucar*; that *St. Lucar* is ten leagues from *Cadiz*, by sea, and about six leagues by land; that being further towards the head of the bay, it is more difficult to blockade than *Cadiz*, as it is more dangerous for large ships in winter; and when westerly winds prevail, the blockading squadron is obliged to keep to the southward, for safety; that if *St. Lucar* was intended to be blockaded, it would be by the same squadron which invested *Cadiz*. During all the time he was in *Cadiz*, he saw the blockading squadron but twice; he thought the blockading squadron would not take cruising ground off *Cape St. Mary's.*

*Jabez Lovett*, a witness for the defendants, testified, that he sailed in the ship *Connecticut*, as master, from *New-York*, on the 22d *December*, 1807, for *St. Lucar*, where he arrived, the 4th *February*, 1808; that he kept close in shore off *St. Mary's*, and so continued; that being the direct and usual course to *St. Lucar*. After he passed *Cape St. Mary's*, he saw two frigates in the same course. When he left *New-York*, he did not suppose *St. Lucar* blockaded; but on his arrival, he found that both *St. Lucar* and *Cadiz* were considered as blockaded, and were so considered during his stay there, about two months; that he was told that the blockading squadron might be seen almost every day, though he saw it but twice. When he came out of *St. Lucar*, he saw the fleet to the southward and eastward, and supposed that they must have seen him, as he anchored in sight of the fleet, in a secure situation, until night, when the fleet usually keep off; he then came out, the night being dark, and the wind favourable, and escaped without being seen. That he took the bearings of the fleet from his mast-head, before night, and counted 29 sail.

A witness, who was at *Cadiz* in *January*, 1808, testified, that it was there universally understood, that both *St. Lucar* and *Cadiz* were blockaded. The same ships which invested *Cadiz* would be employed to blockade *St. Lucar*, if it was intended to be blockaded. While the witness was at *Cadiz*, innocent cargoes, not provisions, were sometimes allowed to pass, and some vessels were turned off. Small vessels were stationed off *St. Mary's*, more effectually to enforce the blockade; and they occasionally cruised to *St. Mary's*. By keeping close to the shore, it was easier to get into *St. Lucar* than into *Cadiz*, from *St. Mary's;* that he saw a gun-brig off *St. Mary's*, in *October* or *November*, 1807. *St. Lucar* is about 15 miles from *Cadiz*, and cargoes landed there, are conveyed in boats, with convoy, to *Cadiz*, which was a reason for including both places in the blockade; that the blockade was more strictly enforced, in *January* and *February*, 1808.

The defendants then offered in evidence, a letter, dated the 8th *January*, 1808, from Mr. *Canning* to Mr. *Pinkney*, the *American* minister at *London*, which letter was contained in a pamphlet, printed at *Washington*, by *A. & G. Waite*, printers to congress, in 1808; and which was entitled, " message from the president of the *United States*, transmitting copies of all acts, decrees, &c. relating to the commercial rights of neutral nations since 1791, in pursuance of a resolution of the house, 11th *ultimo, December* 23d, 1808, read, and ordered to lie on the table." The letter and pamphlet being objected to, were rejected by the judge.

By the proceedings of the vice-admiralty court at *Gibraltar*, it appeared, that the *William Tell* and cargo were condemned for having " violated the blockade of the ports of *Cadiz* and *St. Lucar*, after the public notification thereof by the orders in council, and during the notorious existence of the same, *de facto*, by sailing

NEW-YORK,
Nov. 1810.

RADCLIFF
v.
UNIT. INS. Co.

to the port of *St. Lucar* with a cargo of provisions," &c.

The judge charged the jury, that there was not an actual blockade of *St. Lucar*, at the time the *William Tell* was captured, as the blockading squadron appeared to be blown off towards *Cape Spartel;* and that the capture by the *Imogene* was wrongful, and a peril within the policy. That admitting that there was an actual blockade of *St. Lucar*, at the time of the capture; yet as the vessel ought first to have been turned away, the capture was illegal, and the defendants answerable for the loss, notwithstanding the clause in the policy; and he directed the jury to find for the plaintiffs, as for a total loss; and the jury found a verdict accordingly.

A motion was made to set aside the verdict, and for a new trial, which, by agreement, was argued by the counsel on both sides, upon paper. But the points discussed are so fully considered in the opinion delivered by the court, that it is considered unnecessary to state the arguments, which were voluminous.

*Hopkins* and *Emmet,* for the plaintiffs.

*Wells, Harison* and *Hoffman,* for the defendants.

KENT, Ch. J. delivered the opinion of the court. These causes were argued by the counsel upon paper, and as the questions which they involve are interesting, I have given the subject a very particular consideration.

The two principal questions are, 1. Was the capture, under the circumstances that attended it, a risk within the policy, admitting *St. Lucar* to have been a blockaded port? 2. Was *St. Lucar* at the time of the capture, a blockaded port?

I have stated the points in this order; for if the first question be determined in favour of the plaintiffs, the examination of the second becomes unnecessary.

1. The policy, contains the following clause, viz. <span>NEW-YORK, Nov. 1810.</span> " the insurers take no risk of a blockaded port, but if turned away, the assured to be at liberty to proceed to a <span>RADCLIFF v. UNIT. INS. Co.</span> port not blockaded." This is a new provision in the contract, which has never, with us, received a judicial construction.

The judge, at the trial, told the jury, that admitting *St. Lucar* was blockaded, yet, inasmuch as the vessel ought to have been turned away, the capture was illegal, and the underwriters were answerable. This appears to me to be too confined a construction of the clause. If it applied only to lawful captures, founded upon an actual breach, or an attempt to break the blockade, it would be a provision in a great degree useless ; for by the law, as it exists without the clause, the insurer is not responsible for a loss, incurred by an actual breach of neutral duty, when the property is warranted neutral, unless the breach be such as to amount to barratry in the master. The words ought to be taken in a more enlarged sense. If the loss happens on account of the blockade of the port, no matter by what means, it was one of the risks which the insurers did not intend to assume, for they take "no risk of a blockaded port." The words are broad enough to include this case ; and there seems to be no good reason why we should not give them their ordinary and popu-lar meaning, especially, when that meaning coincides with the grammatical sense. The vessel was taken and condemned, as and for a breach of blockade. Of this fact there can be no dispute. The sentence of condem-nation is explicit, and the only question which can be made is, that the facts in the case did not warrant the sentence. But I think it is sufficient for the defendants to show, that the loss arose by reason of the blockade, in order to bring the case within the exception; and that under this special stipulation, we are not to inquire, whe-ther the belligerent was strictly justifiable, in condemn-ing the property for a violation of the blockade. It is

sufficient, as between these parties, that the loss was incurred upon that account. If the insurer is to take "no risk," he must be discharged from *every risk*, arising from a blockaded port. Those risks may be numerous and difficult to define, of which the risk of being chargeable with a constructive notice of the blockade, and an intent to evade it, is perhaps not the least material. The risk may arise from illegal, as well as legal captures, founded on the fact of the blockade. Another risk is the interruption of the voyage, by being turned away from the port; and the policy makes special provision against the contingency of this risk; and for that reason only was this particular risk mentioned; it does not, therefore, control the generality of the preceding words. General words are to be understood in a general sense, if there be nothing in the contract which shows a clear intent to limit their meaning.

The case of *Goix* v. *Knox*, (1 *Johns. Cas.* 337.) is somewhat analogous. The policy there contained a special clause, that the insurance was to be "against all risks;" and the court gave it a construction as broad as the terms, and extended the policy to all losses, except such only, as might arise from the fraud of the insured. Words of similar import ought to receive the same construction, when they are inserted to restrain the policy for the benefit of the insurer, as when they are inserted to enlarge it for the benefit of the insured, provided they be not carried so far in the former case as to become repugnant to any valid insurance. An insurance is often made against particular risks, by name, to the exclusion of all others. We have an instance of this, in *Robinson* v. *The Ma. Ins. Co.* (2 *Johns. Rep.* 89.) and why should a policy, excluding all risks arising from a blockaded port, be deemed extraordinary? We must collect the sense of the parties, from the language they have thought proper to use. We cannot go beyond the instrument to conjecture their motive and meaning. There may, how-

ever, be very substantial reasons given for the compre- NEW-YORK, Nov. 1810.
hensive extent of the clause, and why the insurer would
not take upon himself the arduous task of showing, in RADCLIFF
every instance, a sufficient cause for the capture. The UNIT. INS. C
breach of blockade is often a complicated fact, and it in-
volves an inquiry into the knowledge and intent of the
offending party, which may depend upon multifarious
proof, and a critical examination of all the circumstances
attending the captured vessel. From what appears in this
case, the offence does not seem to have been made out;
for notice to the party of the existence of the blockade,
by means of a previous notification to his country, or by
notice to the individual, either actual or constructive,
seems requisite, before the neuter can be deemed *in
delicto*. This principle is obviously just, and it is con-
stantly recognised in the *English* high court of admiralty.
(3 *Rob. Adm.* 328. 4 *Rob. Adm.* 80. 6 *Rob. Adm.* 66.)
No such notice is shown in this case, and therefore,
judging from what appears before us, I should deem the
capture unlawful. I am aware, however, that we are
not prepared to judge of its legality, for we have not the
evidence before us, upon which the prize court pro-
ceeded; and it would be unjust to arraign the sentence
without being possessed of the testimony. If the know-
ledge of the blockade was brought home to the party,
the condemnation was, undoubtedly, correct; and whe-
ther it was or not, could only be determined by the
evidence at the trial, which consisted of " sundry exami-
nations, taken in preparatory, in the cause, as also the
several papers and documents found on board the
brig, at the time of the capture, and delivered into the
registry upon oath." The very fact of being caught, as
this vessel was, close in to the *Portuguese* shore, and
avowedly bound to *St. Lucar*, was ground, if not duly
explained, from which to infer the intent; especially,
if the vessel was studious to avoid attention, instead
of going up to the cruizer, to inquire as to the con-

NEW-YORK,
Nov. 1810.

RADCLIFF
v.
UNIT. INS. Co.

dition of the port. The *destruction of papers* has been held to be, of itself, "evidence for condemnation," by the ordinances both of *France*, and of the *United States*. This shows, from what delicate circumstances an inference of guilt may be drawn; and if the captain knew of the blockade, and meant to evade it, he had approximated sufficiently towards the scene of action, to render himself responsible. *Si in confiniis hostium deprehendantur, præsumuntur hostibus advehi. Quæ enim proxima locis obsessis deprehenduntur, non alia ratione publicantur, quam quod ex facto tacite ad hostem commeandi propositum colligatur.* (*Bynk. Quest. J. Pub.* b. 1. c. 11.)

On the first point, then, I am of opinion, that the charge to the jury was incorrect.

The counsel for the defendants seem to admit, that the actual existence of the blockade must be made out affirmatively by them. They are correct in this opinion; but the interest of the parties to the policy requires, that the clause in question should be liberally construed, as to the existence of a blockade, so long as the blockade was not a mere pretext, and the loss actually arose by reason of it. If the vessel had been turned away from the port by a cruizer, on the allegation of an existing blockade, and had been obliged to go to another port, the assured would not have deemed it just, to have been held to very great strictness of proof, in making out the existence of a lawful blockade. The parties to such contracts have in view plain matters of fact, which address themselves to the senses, and affect the voyage, rather than difficult inquiries into the lawfulness of the causes which produce the exercise of power. What combination of facts will amount to a naval blockade has been a subject of much dispute. It was a point in issue between *England* and the *Baltic* confederacy. The parties to the policy did not, probably, mean to involve themselves deeply in this inquiry. A blockade upon the most enlarged definition which has been allowed by any

of the authorities upon public law, and with adequate means to carry it into execution, would produce, as to the contract in question, all the effects and all the mis- chief of the most legitimate blockade. But whatever definition we may adopt, as being within the meaning of the policy, is not a point material in this case; for the testimony proves the existence of a blockade in its strictest form. I shall now proceed to examine the facts with this view.

2. The jury appear to have concurred instantly, and without leaving the bar, in the opinion of the judge, that the blockade of *St. Lucar* was not shown. But it ap- pears to me, that the weight of evidence was decidedly the other way; and that it preponderates so strongly, that the verdict, for that cause alone, ought to be set aside.

The sentence of condemnation by the court of vice- admiralty contains the express allegation, that *St. Lucar* was blockaded, not nominally, but *de facto;* and the vessel and cargo were condemned for an attempt to violate it. This sentence will be acknowledged to be presumptive, or *prima facie* evidence of the fact, and it stands as good proof until that presumption be destroyed. The testi- mony delivered at the trial, appears to me to confirm it.

*Jabez Lovett* entered *St. Lucar*, on the 4th of *February*, 1808, which was only seven or eight days after the cap- ture; and a fact attending his getting in, furnishes some light on the subject. He kept close in shore off *Cape St. Mary;* and after he had passed it he continued so, when he saw two frigates in the same direction with him- self, and he then altered his course. When he arrived at *St. Lucar*, he found that both that port and *Cadiz* were considered to be blockaded; and so continued to be considered for the two months that he stayed there; and he was told that the blockading squadron might be seen almost every day. When he came out, he saw the fleet of 29 sail to the southward, and he escaped in the

night unnoticed. No proof can be stronger than this of a blockade, in fact, during the months of *February* and *March*, 1808, and it is carried back, in point of time, to within a few days of the capture. Who can know more certainly of the truth of the blockade, than the inhabitants of the port, who are the victims of it? *Richard Bailey* was at *Cadiz*, during the month of *January*, 1808, and only 15 miles from *St. Lucar*, and he says, it was then universally understood that both *Cadiz* and *St. Lucar* were blockaded, and that the same ships which blockaded *Cadiz* would be employed to blockade *St. Lucar*, if intended to be blockaded; that small vessels were stationed off *St. Mary's*, more effectually to enforce the blockade, and the cruizing of small vessels occasionally extended there. That the blockade was more strictly enforced in the months of *January*, *February*, and *March*, 1808, and that the reason of including *St. Lucar* in the blockade was, that cargoes landed there were conveyed in boats, along shore, to *Cadiz*.

These two witnesses being upon the spot, spoke from what they saw, and from what was known at the places invested. Their testimony, therefore, is much stronger, and will weigh more in the scale of evidence, than that of many witnesses not present, and who testify only to a distant hearsay.

The letter of Mr. *Canning* to Mr. *Pinkney*, of the 8th of *January*, 1808, would have still further corroborated the proof of the blockade, as it was decisive evidence of the intention of the *English* government to include *St. Lucar* in the blockade of *Cadiz*, and to carry the blockade, at the entrances of those ports, into "the most rigorous" effect. This letter, I think, ought to have been admitted in evidence. It appears to have been printed at the city of *Washington*, by persons whom the defendants offered to show were printers to congress, and to have composed part of a set of public documents transmitted to congress, by the president of the *United States*.

A greater strictness of proof, in respect to such public matters of state, and when they are introduced collate- rally, and not as matter of fact in issue, would be incon- venient, and is not now, in practice, required. Thus in the case of *The King* v. *Holt*, (5 *Term Rep.* 436.) the K. B. held that the *London Gazette* was *prima facie* evidence of matters of state; and in *Talbot* v. *Seaman*, (1 *Cranch*, 38.) a *French* decree was allowed by the supreme court of the *United States* to be read, upon no higher proof than that which attended the letter in question.

To prove the non-existence of the blockade, the plaintiffs relied on the depositions of the captain and mate of the captured vessel. The captain states, that when he was taken off *Cape St. Mary*, and within two leagues of the shore, the *English* fleet, intended for the blockade of *Cadiz*, was blown off, and was upon the coast of *Barbary*, at the distance of 90 or 100 miles from *Cape St. Mary*. How he discovered that fact does not appear, otherwise, than by the assertion, that when he joined the fleet in his captured brig, he found it there; but he does not tell us of the precise time at which he joined it, nor of the date of the storm which blew off the squadron, nor whether the whole fleet was carried off, so as to leave no cruisers behind. The fact of the dispersion of the fleet could not have been known to the *Imogene*, at the time of the capture; for he says that the prize was directed to the fleet "off *Cadiz*." If this momentary dispersion of the fleet, by a storm, is to be relied upon, as a suspension of the blockade, the captain ought not to have reposed on a general assertion, but he ought to have set forth dates, and all the circumstances, with the utmost precision. The deposition, as it stands, is to be read with jealous eyes; for, as was observed on another occasion, "masters have a direct interest to raise a blockade as soon as possible; therefore, their affidavits come with a dead weight about them, that very much

NEW-YORK,
Nov. 1810.

RADCLIFF
v.
UNIT. INS. Co.

sinks their credit." The deposition of the mate directly contradicts the fact of the dispersion of the fleet, for he says, that he went in the lugger, in company with the *William Tell*, until they came up with the fleet, "before *Cadiz;*" and that the *William Tell* was then put in charge of some other vessel, and he "proceeded with the lugger for *Gibraltar;* and that soon *thereafter* they were overtaken by a violent storm, which drove them upon the coast of *Morocco*, in *Africa*." Both he and the captain say, that they did not know or hear of the blockade of *St. Lucar*. But as this is mere negative proof, and founded on hearsay abroad, it cannot be entitled to any consideration, in opposition to positive evidence of the blockade furnished by witnesses on the spot. And to show what little weight is due to such loose reports, the mate has incautiously mentioned, as an instance of the freedom of the port of *St. Lucar* from blockade, the very case of the *Connecticut*, which captain *Lovett* commanded, and which, as we have seen, got in by chance, and at imminent hazard, on the 4th of *February*, 1808, and afterwards escaped from the port in the night, when a fleet of 29 sail were to be seen from the harbour.

This is all the material testimony on the question of the blockade; and, in my judgment, it establishes the fact beyond controversy.

That the naval force employed was competent, both from its amount and situation, to create the blockade of *St. Lucar*, cannot well be doubted, even if we resort to the most favourable definitions of a blockaded port. There was at one time twenty-nine sail counted. The squadron was in daily sight of the port. It had no other fleet within its enclosure to contend with, but the feeble remains of the action of *Trafalgar*. It had frigates and smaller vessels cruising quite up to the *Cape of St. Mary;* and every witness who speaks on the subject, proves, by the facts which he details, that it must have

been at all times hazardous to enter, against the consent of the blockading squadron. The only thing required by the convention of the *Baltic* powers, in the year 1780, to constitute a blockaded port, was, that there should actually be a number of enemy's ships stationed near enough to make an entry evidently dangerous; and the definition in the ordinance of congress, in the year 1781, is to the same effect. And it is worthy of observation, that this ordinance makes it lawful to take and condemn all vessels of all nations " destined to any such port," without saying any thing of notice or proximity. (*Journals*, vol. 7. 186.) In the subsequent convention of the *Baltic* powers, in the year 1800, and which was signed by *Russia* and *Sweden*, in *December* of that year, the definition is to the same purpose. It is " where the disposition and number of the ships shall be such as to render it apparently hazardous to enter." When this is the case, they admit (art. 4.) an entry without notice, to be equal, in point of violation of neutrality, to an attempt to enter by force or artifice, after notice. (*N. A. Register for* 1801, tit. *Public Papers*, 126.) I have the more readily alluded to these descriptions of a naval blockade, because the same definition was incorporated into the convention between *Great Britain* and *Russia* in 1801, and the principle of that treaty has been declared by the court of errors, in the case of *Vos & Graves* v. *The United Ins. Company*, (2 *Johns. Cas.* 475.) to merit " high respect from all neutral powers." I ought, however, to observe, that the doctrine of blockade, as uniformly laid down by Sir *William Scott*, though accompanied, as it ought to be, with extreme sharpsightedness as to cases of fraud, is much more just and liberal than the precedents which I have cited. Not one of those efforts to define or to check the abuse of the right of blockade, speak of the necessity of any previous notice. They seem to charge the neutral with constructive knowledge

of his duty and of his fault, arising out of the very existence of the blockade; and upon their principles, the *William Tell* must have been rightfully condemned.

But if the fact of the dispersion of the fleet by a storm had even been made out, (and this is the main circumstance on which the plaintiffs rely,) it would not have altered the case. Such an accidental removal of the fleet does not suspend the blockade, provided the fleet uses all due diligence to reassume its station. That such was the case here cannot be doubted; for on the 4th of *February*, when Captain *Lovett* entered *St. Lucar*, he found two frigates on his track, and the port was then considered as blockaded, and the fleet was to be seen daily. If the neutral arrives before the port, when the blockading squadron is driven off, and he is ignorant of the cause of the removal of the force, he is not answerable for a breach of the blockade. I have no doubt of the solidity and justness of this principle. But if he knows, or is fairly chargeable with notice of the cause of the absence of the fleet, and that cause be an accidental dispersion by winds or storms, an attempt to take this opportunity to enter and to carry provisions to the besieged, would be a fraud upon belligerent rights, and a breach of blockade. It would be taking an unjustifiable part in the contest, which no candid neutral, bound to good faith, would advise, and which no belligerent power would tolerate. Though ignorance of the cause of the removal of the investing force will excuse the neutral, yet the blockade is still recognised by the law of nations as existing. This is said to be so laid down by all the writers who treat on the subject. *Hubner*, who carried as far as any writer the extension of neutral claims, admits, that the belligerent may use the most rigorous rights of war towards those who act with ill faith relative to besieged places; he says, that this ill faith must always exist in the

NEW-YORK,
Nov. 1810.

RADCLIFF
v.
UNIT. INS. Co.

case of neutral vessels approaching a blockaded port; and he mentions, with apparent approbation, the case cited by *Grotius* from *Plutarch*, of the execution of the master of a vessel, who was taken carrying provisions to *Athens,* which was at that time besieged. (*De la saisie des bâti-mens neutres*, tom. 1. p. 87. 115, 116.) If a storm drives a neutral, in spite of himself, within the confines of a blockaded port, he is excusable, and would not be subject to forfeiture; and is it not just that the same physical necessity which would excuse the one, should not operate to the prejudice of the other? Here the belligerent might say, *Hanc veniam damus petimusque vicissim.*

The case of *Williams* v. *Smith,* (2 *Caines*, 1.) does in no respect deny or contradict this principle. The general language there used was applicable only, and so intended, to the fact before the court, of a blockade raised " in consequence of a naval expedition." Nothing was said by the court of the suspension of a blockade by a storm. The facts did not call for an opinion, or direct the attention of the court to that point; and the distinguished counsel(a) who took the lead for the plaintiff in that cause, admitted, upon the argument, that if the position was abandoned by stress of weather, and there was a continual endeavour to return, the blockade was to be considered as existing in full force. This opinion I am free to cite as a great authority, for the author of it was a profound jurist, and as honest and able a statesman as any country ever produced; and I well recollect that he contended, on that occasion, for the value of neutral rights, and for just limits to the pretensions of blockade, with such solidity of argument, such comprehension of principle, and such persuasive eloquence, as to command the tribute of admiration which was so uniformly due to his exalted endowments. In the case of.

(a) The late General *Hamilton.*

*Vos & Graves* v. *The United Ins. Company*, already men-
tioned, the same point was incidentally noticed in the
court for the correction of errors; but the court observed,
" that it was unnecessary to give an opinion on the case
of an actual attempt to enter a port during the interrup-
tion of the blockade, by reason of the blockading squa-
dron being blown off." This express reservation in the
opinion of the court, shows, at least, that the point was
not deemed clear in favour of the neutral pretension, if
any such pretension was ever seriously asserted. And
I am persuaded, that that high court of judicature, (had
its opinion been required,) would not have laid down so
lax a rule of moral conduct, as to justify a neutral in
knowingly availing himself of the accidental dispersion
of a blockading squadron by a tempest, to carry succours
to a besieged port.(a)

(a) The following extract of a letter from Mr. *Marshall*, secretary of
state, (now chief justice of the supreme court of the *United States*,) to Mr.
*King*, the *American* minister at *London*, dated *September* 20, 1799, shows
the opinion of our government on this subject.

" The right to confiscate vessels bound to a blockaded port, has been un-
reasonably extended to cases not coming within the rule, as heretofore
adopted.

" On principle it might well be questioned, whether this rule can be ap-
plied to a place not completely invested by land as well as by sea. If we exa-
mine the principle on which is founded the right to intercept and confiscate
supplies designed for a blockaded town, it will be difficult to resist the con-
viction, that its extension to towns invested by sea only, is an unjustifiable
encroachment on the rights of neutrals. But it is not of this departure,
which has received sanction from practice, that we mean to complain. It is,
that ports, not effectually blockaded by a force capable of completely investing
them, have yet been declared in a state of blockade, and vessels attempting
to enter therein have been seized, and on that account confiscated.

" This is a relaxation proceeding directly from the government, and which
may be carried, if not resisted, to a very injurious extent. Our merchants
have greatly complained of it, with respect to *Cadiz* and the ports of *Hol-
land*.

" If the effectiveness of the blockade be dispensed with, then every port of
all the belligerent powers may, at all times, be declared in that state, and the
commerce of neutrals be thereby subjected to universal capture. But if this
principle be strictly adhered to, the capacity to blockade will be limited by
the naval force of the belligerent, and of consequence, the mischief to neu-

The blockade being established, the verdict in each cause is, in every point of view, against law and evidence, and ought to be set aside and a new trial awarded, with costs to abide the event of the suit.

New trial granted.

tral commerce cannot be very extensive. It is, therefore, of the last importance to neutrals, that this principle be maintained unimpaired.

" I observe that you have pressed this reasoning on the *British* minister, who replies, that an occasional absence of a fleet from a blockaded port, ought not to change the state of the place.

" Whatever force this observation may be entitled to, where that occasional absence has been produced by accident, as a storm, which for a moment blows off the fleet, and forces it from its station, which station it immediately resumes; I am persuaded, that where a part of the fleet is applied, though only for a time, to other objects, or comes into port; the very principle requiring an effective blockade, which is that the mischief can then only be coextensive with the naval force of the belligerent, requires, that during such temporary absence, the commerce of neutrals to the place should be r ee."