DE LOYNE v. DAVIDSON. See Case No. 14,921.

DELPHOS, The (UNION TOW-BOAT CO. v.). See Case No. 14,400.

---

## Case No. 3,777.

### The DELTA.

[Blatchf. Pr. Cas. 133.][1]

District Court, S. D. New York. April, 1862.[2]

PRIZE—TEST OATH—MORTGAGES IN PRIZE COURT—WHAT IS ENEMY PROPERTY—TRANSFER TO NEUTRAL—BLOCKADE.

1. A test oath is an oath of ownership simply, and all papers annexed to such oath will be

---

[1] [Reported by Samuel Blatchford, Esq.]

[2] [Affirmed in Case No. 3,778.]

stricken from the record as irregular. The fact of the ownership, with a general denial that the captured property is lawful prize of war, is all that is proper to include in the claim.

[Cited in The Napoleon, Case No. 10,012; The John Gilpin, Id. 7,343.]

2. A mortgagee of captured property has no right to assert his mortgage in a prize court, and demand its payment out of the proceeds of the property if condemned. All liens upon captured property, which are not in their very nature open and apparent, like that of freight upon the cargo laden on board a captured vessel, are utterly disregarded in prize courts.

3. Property belonging to a merchant residing and trading at an enemy port is, when captured, liable to condemnation as enemy property. The evidence discussed, showing that the transfer of the vessel by an enemy to a neutral was colorable and not real.

4. A transfer of an enemy vessel by an enemy to a neutral during the war, and for the purpose of her continuance in trade with the enemy, is void, even though made in good faith and for a valuable consideration.

5. The true destination of the vessel in this case was not disclosed upon her papers. The defence set up, that the vessel made inquiry at a neutral port as to the blockade, and was informed that it had been raised, and then directed her course towards a blockaded port in order to make inquiry there as to the existence of the blockade before attempting to enter, shown to be groundless.

6. A contingent destination to a blockaded port, if it in fact existed, must appear on the ship's papers.

7. Where knowledge of a blockade exists at the commencement of the voyage of a vessel, she cannot lawfully approach a blockaded port, even for the bona fide purpose of inquiring as to the continuance of the blockade; and, if she does, she is liable to capture.

[Cited in The Empress, Case No. 4,477; Stokely v. Smith, Id. 13,473.]

8. Vessel and cargo condemned.

BETTS, District Judge. The brig Delta was captured on the 28th of October, 1861, while attempting to enter the blockaded port of Galveston, in Texas, by the United States ship-of-war Santee, commanded by Commodore Henry Eagle, and sent to the port of New York for adjudication. A libel was filed in this court, containing the usual averments of the capture as lawful prize of war, and praying for a decree of condemnation of the vessel and cargo, on the 27th of November, 1861. On the 17th of December thereafter, Seth Adams and Isaac Adams, citizens of Massachusetts, intervened and claimed the vessel, as assignees of Charles W. Adams, the mortgagee of the vessel, for the sum of £1,900 sterling. They alleged that, at the time of the capture, the said Charles W. Adams, the mortgagee, and the assignor of the mortgage, was in possession, under a charter-party between himself and the mortgagor, one John A. Marsh, of Liverpool, England. The claim contains a general denial of the validity of the capture, and is supported by the test affidavit of Isaac Adams, one of the claimants. On the 7th of January, 1862,

John A. Marsh, of Liverpool, England, a British subject, intervened, through Williams, the master, and filed his claim as owner of the vessel. On the same day, and by the same proctor, Charles W. Adams, interposed his claim to the cargo laden on board the brig, as its sole owner, and to the vessel, as charterer for the voyage; and also set up an interest sought to be covered by the transaction, which it is supposed was secured and effectuated in his after arrangements with and through the two other claimants, his brothers, Isaac Adams and Seth Adams.

The points developed upon the direct issues in the suit, through the preparatory proofs, and the vessel's papers found on board at the time of her seizure, had been pressed upon the court by the respective counsel, in oral and written arguments of great thoroughness and force, in which they have been allowed by the court a range of debate beyond the ordinary measure of judicial discussions. Under the decision of the court in previous cases, the voluminous matter sought to be introduced by the claimant in this case, by way of notarial protest annexed to the test oath, is to be stricken from the record, as irregular and inadmissible in a prize proceeding. The test oath in a prize cause is the oath of ownership simply, and the fact of this ownership, with a general denial that the captured property is lawful prize of war, is all that it is proper to include in the claim. In the course of the argument, the counsel for the captors cited and commented upon the following authorities: The Spes and The Irene, 5 C. Rob. Adm. 76; The Betsey, 1 C. Rob. Adm. 332; The Neptunus, 2 C. Rob. Adm. 110; The Little William, 1 Act. 141; Wheat. Capt. Mar. 343, 353–355; Wheat. Int. Law, 345; 2 Wheat. [10 U. S.] Append. 4; The Hiawatha [Case No. 6,451]; The Revere [Id. 11,716]; 1 Kent, Comm. 149, 153; Yeaton v. Fry, 5 Cranch [9 U. S.] 335; Maryland Ins. Co. v. Woods, 6 Cranch [10 U. S.] 29; Fitzsimmons v. Newport Ins. Co., 4 Cranch [8 U. S.] 185; Radcliff v. United Ins. Co., 7 Johns. 38; The Diana, 5 C. Rob. Adm. 67; The Twilling Riget, Id. 82; The Tobago, Id. 218; The Marianna, 6 C. Rob. Adm. 24; The Charlotta, 1 Edw. Adm. 252; The Ann Green [Case No. 414]; The Frances, 8 Cranch [12 U. S.] 418; The Betsey, 1 C. Rob. Adm. 98; The Mentor, Id. 181; The Sarah Christina, Id. 239; The Aquila, Id. 37; The Hope, 4 C. Rob. Adm. 215; Several Dutch Schuyts, 6 C. Rob. Adm. 48. The counsel for the claimants cited the following authorities: The Little William, 1 Act. 141; Yeaton v. Fry, 5 Cranch [9 U. S.] 335; Maryland Ins. Co. v. Woods, 6 Cranch [10 U. S.] 29; Fitzsimmons v. Newport Ins. Co., 4 Cranch [8 U. S.] 185; 2 Elliott, Dip. Code, 665; Id. 528, 530; Wheat. Capt. Mar. Append. 343, 352–355; 3 Wheat. [16 U. S.] Append. 4; The Henrick and Maria, 1 C. Rob. Adm. 148; The Aina, 18 Jur. 682; The Constantia Harlessen, Edw.

Adm. 232; The Belvidere, 1 Dod. 356; Conkl. Pr. 374; Die Jungfer Charlotta, 1 Act. 171; 3 Phillim. Int. Law, § 311; The Columbia, .1 C. Rob. Adm. 154; The Dickenson, 1 Hay & M. 1; Fland. Mar. Law, 168, note 3; Radcliff v. United Ins. Co., 7 Johns. 38, 9 Johns. 277; Phil. Ins. (3d Ed.) 459; Sperry v. Delaware Ins. Co. [Case No. 13,236]; The Shepherdess. 5 C. Rob. Adm. 264; Del Col v. Arnold, 3 Dall. [3 U. S.] 333; Die Fire Damer, 5 C. Rob. Adm. 357; The Maria Powlona, 6 C. Rob. Adm. 237; The Fortuna, 2 C. Rob. Adm. Append. 385.

Preliminary to the main question of prize or no prize, to be determined upon the proofs, is one in relation to the character of the ·claim of Isaac and Seth Adams, and their right to assert the same as against the libellants and captors. Although the conclusion at which the court has arrived upon the main question cannot be affected by a determination as to the right of a mortgagee of captured property to assert his mortgage in a prize court, and demand that it be paid out of the proceeds of the property, if condemned, it is, nevertheless, proper to consider that question. Charles W. Adams, being the sole owner of the brig, executed a bill of sale to the claimant Marsh, on Liverpool, and took back from him a mortgage, to secure the purchase money, amounting to the sum of £1,900 sterling. The claimants, Isaac and Seth Adams, come into court solely as the holders and owners of this mortgage. There is, perhaps, no doctrine better settled in the law of maritime capture than this, that all liens upon captured property, which are not in their very nature open and apparent, (like that for freight upon .the cargo laden on board a captured vessel,) are utterly disregarded by prize courts. The great principles of international law in respect to · prize require that no such liens, no mortgages, no bottomry bonds, no claims for repairs, supplies or advances, should be allowed to cover and protect private property while sailing on the ocean. If the door was once open for the admission of equitable claims and liens, there would be no end to discussion and imposition, and the simplicity and celerity of prize proceedings would be alike sacrificed. The Francis [Case No. 5,032]; Id., 8 Cranch [12 U. S.] 354; The Josephine, 4 C. Rob. Adm. 25; The Tobago, 5 C. Rob. Adm. 218; The Marianna, 6 C. Rob. Adm. 24; The Sisters, 5 C. Rob. Adm. 155; The Vrow Anna Catharina, Id. 161.

The claim, therefore, of the brothers Isaac and Seth Adams, is one which cannot be regarded in this court. The points at issue, upon which the validity of the capture must rest, are these: 1. Was the captured property, or any portion of it, the property of the enemy, or was it the property of a neutral, or of a loyal citizen? 2. Was the destination of the vessel disclosed by her papers her true destination, or was it simulated and fraudulent? 3. Did the vessel approach the port of Galveston knowing the same to have been effectively blockaded at and prior to the commencement of her voyage, with the bona fide intent to inquire if the blockade was still in .force, and not to attempt an entrance without such inquiry; or did she approach designing to enter, if possible, without inquiry? 4. Knowing of the effective blockade at and before the commencement of her voyage, could the vessel lawfully approach the very mouth of the blockaded port, even for the bona fide purpose of inquiry; and was not such approach, under the circumstances, an unlawful act, subjecting the captured property employed in it to confiscation?

1. Upon the first point—the question of ownership—were there any doubt as to the conclusion which ·must be reached upon the other points in the case, it might be considered that a proper case was presented in which an order should be made for further proofs solely as to the residence of Charles W. Adams, the owner of the cargo of the vessel, and of the vessel herself, at the commencement of the war, and until August 31, 1861. It may be presumed, from the statements which have been made, that such further proof would disclose the fact that Adams was a merchant, resident at Galveston, in Texas. and that he now had a house of trade there, and a partner .there domiciliated. Assuming these to be facts susceptible of proof, it is very clear that the captured property is liable to condemnation, as enemy property. The transfer of the vessel by Adams to Marsh, a British subject, is open to grave supicion, as colorable and false. There is neither proof nor assertion of the payment of any consideration upon the alleged transfer, and the inference that no payment was in fact made would seem to be justly deducible from the fact that a mortgage was retained for £1,900 sterling—certainly not far from the value, when new, of a vessel of the description of the Delta. The pretended vendor of the vessel, in addition to the mortgage, received from the pretended vendee, at the same time, a charter-party of the vessel for the voyage, and the terms of this charter-party, as to possession. as to payment, as to insurance, and, indeed, as to all its provisions, are such as to preclude the idea of any real interest in the property in the claimant, Marsh. The purpose of the transfer is apparent from the facts concomitant and subsequent. It was to give the vessel the semblance of a neutral bottom, while she was actually navigated in the interest of a belligerent party for the purposes of trade with, and aid and benefit to, the enemy of the captors. But, supposing the transfer to Marsh to have been made in good faith and for a valuable consideration, such a transfer could, upon the assumption as to the residence of Charles W. Adams, have no validity; because, being made by one whom the law clothes with a hostile character by virtue of his residence, and being made to a neutral during the war, and, as the sequel shows, for

the purpose of continuing in the trade with the enemy, the transfer was void, as in fraud of vested belligerent rights, and, having no validity whatever, the vessel remains in the same position in law as if the title to her had never passed out of Charles W. Adams.

2. Was the destination of the vessel disclosed by her papers her true destination, or was it colorable, false and fraudulent; and did the vessel approach the port of Galveston, Texas, knowing the same to be effectually blockaded at and prior to the commencement of the voyage, with a bona fide intent to inquire if the blockade was still in force, and not to attempt an entrance without such inquiry; or did she approach designing to enter, if possible, without inquiry? These two points are intimately connected. Much of the evidence in the case having a bearing upon the one, is alike applicable to the other. The answer to the one question necessarily involves the answer to the other, and they will be considered together.

In the examination of the question as to the true or simulated destination of the vessel, as disclosed by her papers, the first thing which presents itself is the extraordinary fact, that a portion of the papers designate Minatitlan as her port of destination, and a portion the port of Matamoras—two Mexican ports many miles apart—the one being in the Vera Cruz province, and the other on the river which separates the United States from Mexico. Now, it is of course perfectly credible that in the incipiency of the adventure the destination of the vessel might have been in good faith changed, and the incongruity in the papers be thus fairly explained. But this incongruity assumes importance when considered in connexion with the other circumstances of the case, all tending to show the fraudulent character of the documented destination. It is then that the question becomes significant. Does not the fact that a portion of the vessel's papers designate Minatitlan as her port of destination, and a portion Matamoras, have a strong tendency to show that her true destination was neither the one port nor the other? The master and the supercargo both assert, in their examination on the standing interrogatories, that the vessel was destined to Matamoras. But upon material points their testimony is so conflicting as to be unreliable upon any; and whether the destination were Minatitlan or Matamoras, the vessel, from the time of her entry into the gulf, had been pursuing a course many miles wide of either port, and when captured was close into Galveston, and steering directly for that harbor. By way of explanation of the locality of the place of capture of the vessel, it is set up, not as in some cases, that she was driven there by stress of weather, or for want of water and provisions, but that the vessel stopped at the island of Grand Cayman, and there made inquiry as to the blockade, and was there informed that it had been raised, or there re-

ceived some information to that effect, and that this caused the alteration in the vessel's course. Now, if this explanation turns out, upon investigation, to be untrue, it affords a very conclusive presumption of the actual criminal intent of the vessel at the outset. Grand Cayman is an island in a group of three, which together contain a fishing population of about 300 souls, lying about 150 miles northwest of Jamaica. Is it credible that the vessel should pass by the numerous British ports of commercial importance in Jamaica for the purpose of inquiry at this petty island, whose humble inhabitants had probably never heard even of a war in the United States? But this is averred in the claims; and, further, that there, at Grand Cayman, they learn that peace negotiations were in progress, and that they were hence induced to change their destination. The testimony in preparatorio completely disproves this. The master swears, answering the 12th interrogatory: "The vessel touched at Grand Cayman, in the West India Islands. We stopped there to get information; we wanted information as to the war in America. I heard that the parties were negotiating peace." The master is contradicted in this by the positive testimony of every other witness. Taylor, the supercargo, answering the same interrogatory, swears: "On the present voyage we stopped nowhere. We passed close to the island of Grand Cayman, but did not stop." And he says not a word as to any information got from the fruit boats which came off. Davidson, the mate, says, answering the same interrogatory: "We touched at no port or place after we left Liverpool before we were taken." He says nothing about Grand Cayman, or information there, or anywhere, received on the voyage, but, on the contrary, ignoring all this, he testifies as follows, when interrogated as to the alteration of the vessel's course: "The captain changed his mind. He called me and the supercargo into the cabin. They then made an entry in the captain's log-book to the effect that we would proceed to Galveston and ascertain if that port was blockaded." Kent, the steward, in answering the 12th and 36th interrogatories, makes no mention of any stop made by the vessel on that voyage. The log-book of the vessel, kept by the mate, contains careful daily entries of the vessel's course, distance, and position, and not only makes no mention of stopping at Grand Cayman, but shows the vessel to have been proceeding steadily on her way, day and night, at the very time fixed by the master as the time of her alleged stopping at Grand Cayman. The captain's log-book is produced, containing the entry alluded to by the mate, and it is a notable circumstance that it is about the only entry contained in it. That it is a false entry is sufficiently established by the testimony before recited. It declares that the vessel stopped at Grand Cayman; that fruit boats came

off; that they got no positive information, but were given to understand that peace was in negotiation. It further states that the alteration of the destination was "by direction of the supercargo."

It is impossible to consider the facts in proof, with all their attending incidents and circumstances, and arrive at any other conclusion than this: that the destination of the vessel declared by her papers was false and fraudulent, and that, from the beginning, she was bound to Galveston, not with any design of making honest inquiry before attempting to enter, but with the deliberate purpose, on the point of being accomplished, and which the capture alone defeated, of entering that port, in spite and in violation of the blockade. But, again, as matter of law, the falsity of the destination of the vessel, as set forth in her papers, is established by the fact that she is documented for a voyage to Matamoras or Minatitlan, disclosing no contingent destination to Galveston. If, as is averred, the voyage was undertaken with instructions to go to Galveston—if, upon inquiry, it was found that the blockade of that port was raised—then the ship's papers are false, because they fraudulently conceal the fact of the contingent destination to Galveston, and represent the destination to be absolutely to Matamoras or Minatitlan. The dishonesty of purpose in the approach to the harbor of Galveston, which is so clearly established by all the circumstances of the case, is confirmed by the fraudulent omission to state on the paper the intent to approach it at all. In The Carolina, 3 C. Rob. Adm. 75, Sir William Scott says: "Had there been any fair contingent deliberative intention of going to Ostend, that ought to have appeared in the bills of lading; for it ought not to be an absolute destination to Hamburg, if it was at all a question whether the ship might not go to Ostend, a port of the enemy. There is, then, an undue and fraudulent concealment of an important circumstance which ought to have been disclosed." See, also, The Margaretha Charlotte, 4 C. Rob. Adm. 78, note. The same principle is laid down in the late case of The Union, 1 Spink's Prize Cas. 164. The evidence in the case thus plainly indicates that the voyage of the Delta was conceived with the fraudulent design of violating the belligerent rights of the United States, and, by evading the blockade established by authority of the government, to give aid and assistance to the enemy. To accomplish this, she was furnished with a simulated, neutral ownership, and with papers concealing her true destination and proclaiming a false one. Being captured at the mouth of the blockaded port in the attempt to enter it, hundreds of miles away from her course to the port of her ostensible destination, a story is invented, by way of explanation, which turns out to be utterly false, a mere fabrication, and therefore tending only to cumulate the proof of culpability and dishonesty. Upon the second and third points at issue, then, the court can entertain no doubt of the validity of the capture, and of the necessity of decreeing condemnation of both vessel and cargo.

4. Knowing of the effectual blockade of Galveston at and before the commencement of the voyage, could the vessel lawfully approach the very mouth of the blockaded port, even for the bona fide purpose of inquiry, and was not such approach, under the circumstances, an unlawful act, subjecting the captured property employed in it to capture and confiscation? This point is distinctly raised by the arguments of counsel in the cause, and is legitimately developed by the proofs and papers, as well as by the claims. It is, therefore, proper, that it should be passed upon by the court, although its determination may not affect the result in this suit, by reason of the conclusion arrived at upon the previous points.

It is conceded—and if not, it is a part of the history of the case, and sworn to by all the witnesses—that all concerned in the adventure had knowledge, full and complete, of the actual effective blockade of the port of Galveston, at and prior to the commencement of the voyage in which the vessel was captured. It is well established by repeated decisions of Sir William Scott, the great master of British prize law, that a neutral trader cannot, with knowledge of a blockade, lawfully go to the station of a blockading force under the pretence of obtaining information as to its continuance. The inquiry must be made elsewhere, not there. "The merchant," says the learned judge, "is not to send his vessel to the mouth of the river, and say, 'If you don't meet a blockading force, enter; if you do, ask a warning and proceed elsewhere.' Who does not at once perceive the frauds to which such a rule would be introductory? The true rule is, that after knowledge of the existing blockade, you are not to go to the very station of the blockade upon pretence of inquiry." The Spes and The Irene, 5 C. Rob. Adm. 76; The Betsey, 1 C. Rob. Adm. 334; The Neptunus, 2 C. Rob. Adm. 110; The Little William, 1 Act. 141, 161. The reason and necessity of the rule, as laid down by Sir William Scott, is too obvious to require argument in its support. Were it once relaxed, so as to allow the approach of neutral traders to the mouth of a blockaded port for the purpose of inquiry, the blockade of the ports of the insurgent states could not be made effective by the combined naval forces of all nations. Such a relaxation would operate as a universal licence to the merchant vessels of the world to attempt to enter a blockaded port, for a failure to do so would be attended with no hazard. The soundness of this principle has not been called in question by any decision of the courts of this country, and its wisdom will probably be approved so long as a belligerent blockade is recognized in

international law as a legitimate and efficient method of prosecuting a public war.

This decree was affirmed, on appeal, by the circuit court, July 17, 1863 [Case No. 3,778].